[No. 21440. Department Two. September 10, 1929.]

W. H. PERRY, *Appellant,* v. C. D. HILLMAN, *Respondent.*[1]

690

*S. H. Kelleran* (*A. L. Erickson,* of counsel), for appellant.

*Poe, Falknor, Falknor & Emory,* for respondent.

Millard, J.—By amended complaint, plaintiff seeks recovery for services performed for the defendant under an oral agreement. The defendant, by answer, entered a general denial, pleaded the statute of frauds and the statute of limitations as affirmative defenses and, by cross-complaint, prayed recovery for certain moneys converted by, and for money loaned to, the plaintiff. The cause was tried to the court without a jury, resulting in findings and conclusions that all of plaintiff's claims for compensation, except those affecting the Cathcart properties, were barred by the statute of limitations; and in favor of the plaintiff on defendant's cross-complaint. Judgment was entered in plaintiff's favor for seven hundred fifty-nine dollars and eighty cents on the Cathcart claims. The plaintiff has appealed.

In July, 1920, W. H. Perry and C. D. Hillman entered into an oral agreement under which Perry was employed to manage, as assistant, the business, affairs and properties of C. D. Hillman. During the course

of that employment, five deals were consummated, as follows:

The Hamilton transaction, concluded on September 29, 1920, involved the transfer by Hillman of a ranch to one Hamilton. The Wineman settlement, consummated in November, 1920, was a deal in which appellant claims respondent agreed to pay him ten per cent of whatever was saved out of certain litigation. Sale of certain Hillman lands to one Bardshar. The Baker transaction, which involved the exchange of certain lands and personal property, and consummated in March, 1922. The Cathcart transactions consisted of sales of numerous lots and parcels of lands in respondent's Cathcart holdings made by appellant while acting as general agent or manager of respondent and prior to appellant's departure in June, 1922, for California. Respondent orally agreed that appellant would receive his compensation out of cash which was paid in under contracts of sale, the appellant to receive one-half of all cash paid in, as and when paid, until the full compensation of ten per cent had been liquidated. Various payments were made to the respondent upon the sales by the purchasers, part of which were remitted by respondent to appellant, the last remittance being made during the year 1924. There was due, at the beginning of this action, from the respondent to the appellant, upon account of sales to nine persons, a total of seven hundred fifty-nine dollars and eighty cents.

Under an oral modification in June, 1922, of the oral agreement of July, 1920, Perry was transferred from Hillman's Seattle office to California. Perry claims that he assisted in consummating, in October, 1922, the Whitley deal in California, which involved the sale by Hillman to Whitley of the Estrella Ranch.

The appellant's expenses, necessary in connection with the management of the respondent's business, were paid by the respondent. The appellant's compensation was contingent upon the amount of business in making sales or exchanges of properties, the percentage to be an amount equal to five per cent of the purchase price or value of the property when the transaction was consummated partly through the efforts of the appellant, and an additional five per cent if the deal was consummated solely through appellant's efforts. By his amended complaint, the appellant alleged that the efforts of the parties were to be directed to the preservation and protection of the large holdings of the respondent and to discharging the incumbrances and tax liens against the same; that all moneys, property or other profits derived by the respondent through the sales, exchanges or transactions,

". . . falling within the agreements aforesaid, or otherwise, should be devoted primarily to the purposes aforesaid, and that payment of plaintiff's compensation, accrued and to accrue, save that as resulting from sales heretofore alleged, should be deferred until the defendant, by reasonable diligence and efforts and within a reasonable time, should accomplish, or be placed in a position reasonably to accomplish, the purposes aforesaid, and be placed in funds or in a position reasonably to obtain funds available for the payment of such compensation."

Appellant further alleged that his unpaid compensation, which should be computed on the transactions mentioned above, became due in July, 1923, when the primary purposes of the employment were accomplished and the respondent placed in funds available for that compensation.

The trial court found that, under the oral agreement, the appellant performed services in the nature of those

of a general agent, and performed many services inconsistent with the idea that appellant was merely a broker or agent for the sale of the real properties. The original complaint was filed May 3, 1926. For many months prior to May 3, 1923, Hillman was the owner of large parcels of unincumbered real property and also a large amount of unincumbered personal property of the estimated value of one hundred and fifty thousand dollars. Hillman also received one hundred and twenty-five thousand dollars in cash in the Wineman settlement of November, 1920. The court concluded that, for many months before May 3, 1923, the respondent had funds or was in a position reasonably to obtain funds available for the payment of appellant's compensation, and that, by reason thereof, all of the claims of appellant for compensation other than those affecting the Cathcart properties are barred by the statute of limitations (Rem. Comp. Stat., § 159).

Our determination of the question raised by the assignment that the court erred in applying the statute of limitations to the appellant's cause of action, will dispose of the other assignments of error.

Appellant argues that the services were rendered under general and continuous employment, but that, by agreement, payment of appellant's compensation, save that part resulting from sales, should be deferred until respondent, by reasonable diligence and within a reasonable time, should accomplish the primary purposes of the employment, and be placed in funds or in a position reasonably to obtain funds available for payment of such compensation, and that that part of appellant's compensation resulting from sales should be paid to him from time to time as the purchasers made their payments to respondent.

As recited above, there were six transactions for which appellant claimed compensation. The last was

the Whitley deal, which was consummated in September, 1922. Appellants original complaint was filed May 3, 1926. A painstaking examination of the entire record convinces us that the appellant did not, subsequent to the year 1922, perform any services for respondent entitling him to compensation. It is likewise clear that the respondent's affairs were in excellent financial condition the latter part of 1922. The respondent, at that time, was in a position reasonably to obtain funds available for payment of any compensation due to the appellant; and, manifestly, the primary purposes of preservation and protection of the large holdings of the respondent had been accomplished prior to May, 1923. Appellant Perry testified:

"In the latter part of 1922, Mr. Hillman had the balance of the Estrella, about 30,000 acres, and arrangements had been made whereby Mr. Whitley would buy the Wineman mortgage so as to re-lease this twenty-eight or thirty thousand acres. This 30,000 acres would be worth about $20 an acre or $600,000. It was later than that that I offered $700,000 for it, I think in 1923, or the latter part of 1922. He also had the Kern county ranch in the latter part of 1922. Thirty-two hundred odd acres, no mortgage. Mr. Hillman was asking $50,000. We were never able to sell it. We had offers of $50,000 but with a small payment down. The best offer was $50,000 with $15,000 down, balance on mortgage at 6%, three years, as I recall. He wanted $48,000 cash. In the latter part of 1922 he also had the San Diego ranch. A little over 3,000 acres which he sold to me in 1923 for $95,000. That was unincumbered except the judgment of a little over $3,000 which was in dispute. He also had the Berkeley home, valued around $12,000. He also had the Fell street and Divisadero property. I think there was about $47,000 against it and it was worth between sixty and seventy thousand dollars, probably. In the latter part of 1922, he also had the Baker Ranch of 5,000 and some odd acres, a mortgage of $16,500

against it, with some interest and expenses. Then he had the Marysville property of 1,200 acres that was clear. I don't know the value of it; I never had anything on it. I think Mr. Hillman at one time was offered $25,000, but refused the offer. It was unincumbered. In the latter part of 1922, he also had the Oregon properties. There were twenty-eight or thirty thousand acres of that, I don't know that there was a mortgage on it, but there was a number of years' back taxes. As to the value, we were never able to get anything for it. We had offered it as low as $3 an acre, but never got an offer. I don't think it has any value above the taxes. He had the Washoe county land about 1923. I think it was then in November. It was worth about $5 per acre in the latter part of 1922. It was unincumbered except the $1 per acre to the state. That is the equity would be about $4 an acre. In the latter part of 1922, he had considerable property in Washington. He had the Georgetown property which I think was worth from fifty to sixty thousand dollars, subject to a mortgage of $4,000 and there may have been some taxes. He had the Mercer slough property east of Lake Washington near Bellevue, 150 to 170 acres at the end of 1922. I think the Mercer slough property was worth about $250 an acre. In the latter part of 1922, he owned the Cathcart property, less what had been sold under contracts. There were from 7,000 to 7,500 acres at the time, when we started selling. He either owned the land or the contracts against it. I think there were $100,000 to $150,000 in contracts and the balance of the land we were selling at from $50 an acre to $300 an acre. The Cathcart land and contracts combined was worth something like $300,000. Then he owned the mortgage on Birmingham. I think he had $100,000 or $125,000 still in that mortgage. I think it was worth that money. He also had the Boston Harbor mortgage which he sold in 1923 for $50,000 cash and $10,000 preferred stock of the Norpia Realty Company. The University Lake Shore land was probably about 300 lots out in Lake City. They were subject to five or six years' taxes. I think their value would be about $60,000. Also in the

latter part of 1922 he had about 3,000 head of cattle on the Estrella. There was probably $150,000 worth of personal property on that ranch. I believe it was free and clear although there was supposed to be a mortgage against it of somewhere about $90,000; but I think it was free and clear, and he also had probably five or six automobiles and four or five on the Estrella Ranch. Out of the Wineman settlement he got $125,000. I know now that this bail money was drawn down in the latter part of 1922. In selling properties here prior to 1922 he had certain letters from Mr. Maxwell and Mr. Gleason which he gave to his salesmen. I never saw them.''

Respondent testified, in part, as follows:

''In 1922 the value of my holdings in Washington was about $600,000. Cathcart would be worth about $500,000 at that time. On December 7, 1922, the value of the contracts issued for Cathcart sales was $150,000 or $200,000. Pacific City was possibly worth $100,000. University Lake Shore possibly worth $150,000. If you tabulate them in small amounts it will run over a million. I had a mortgage of $75,000 on Mercer Slough. There was nearly $500,000 in first mortgages on land that I had at that time, land worth about $500,000. In the fall of 1921 there were Liberty Bonds owned by myself of $200,000. In the fall of 1922 I owned about $300,000 worth of property in Oregon. There were 27,000 or 28,000 acres free and clear except taxes. The sum and substance of my holdings in the fall of 1922 amounted to over $2,000,000. After the Whitley transaction I was on easy street; I really was on easy street before but after that I was still more on easy street. I eliminated this mortgage of $485,000 and interest. It would be about $514,000 which left the rest of the land and the stock clear. Then in about April, 1923, I received $50,000 from the mortgage on Boston Harbor. Just a week before I wrote Mr. Perry that the bank had called in a loan of $47,000. I went right to the bank at Berkeley and in about an hour borrowed the $47,000 and gave a first mortgage. I could have borrowed $75,000. I might have the mortgage and

note that were given at that time among my possessions some place. I paid it off at the bank. I paid it after the Boston Harbor, but I was paid $50,000 about that time and I took in $50,000 from Boston Harbor and bought Liberty bonds, and I have the receipt here. I did not use it in the Divisadero and Fell street property at all. I put in more money than the $50,000 and bought Liberty Bonds. I did not buy them all the same day because I waited a more favorable market. There was no agreement between Perry and me that I would defer payment on any commission owing him, no agreement that I would defer payment of anything until I had funds or was in a position to obtain funds. If I owed him anything he would get his money in five minutes. If I owed any money I had often $50,000 or $25,000 in the bank and from 1914 to the present time my credit is good at the bank.''

■ The claims sued upon were separate and distinct from each other. A right to compensation would have immediately become due upon the conclusion of each deal, had not payment been deferred by the agreement of the parties until the respondent ''should be placed in funds or in a position reasonably to obtain funds available for payment of such compensation.'' The employment agreement embraced distinct items of service of which appellant claims compensation is due on the six hereinbefore described.

''Where the contract of employment embraces several distinct items of service which can be and are separately performed and the compensation for each is settled and apportioned, the contract is severable, not entire, and as to each item a cause of action accrues and the statute begins to run when that particular service is rendered, . . .'' 37 C. J. 823.

An apposite authority in support of this rule is *Bartel v. Mathias,* 19 Ore. 482, 24 Pac. 918. In that case, the plaintiff sought recovery for services as a general agent in charge of the property and business of the defendant. The court said:

"The items of plaintiff's claim for services under his alleged contract extend from the year 1878 to 1883, and as this action was commenced in 1889, unless the payment of $50 found by the referee to have been made in July, 1887, was a part payment of all of such indebtedness, embraced in such items, it is not disputed that the claim is barred by the statute of limitations. For the plaintiff it was argued that his whole claim was based on an entire contract, and that the statute of limitations did not begin to run until the completion of his services under the contract, and that the payment of the $50 at the time alleged was necessarily a part of the entire claim for such services as sued upon, and precluded the operation of the statute. On the other hand, the contention was that the facts as found from the evidence show that the claim consists of several distinct and separate items for services which were rendered at different times, and in respect to different subject-matters, and that the price to be paid was agreed upon and apportioned to each item when the services were to be performed, and that when so performed, were fully complete and ended as to each item, constituting in themselves distinct and independent transactions upon which a right of action then accrued, so that, when the $50 was paid, there being several specific debts, unless there was specific reference to or an appropriation upon each of them, the payment was a general payment, and would not interrupt the running of the statute.

"It is no doubt true that there are cases which hold to the effect that where there is a long-continued service performed by one person for another, and no time of payment or term of services being stipulated, and small payments have been made from time to time to apply upon the balance due, the services are deemed to be continuous, and a payment made within six years renews the whole claim for the previous services. . .

"The facts as found by the referee show that, at the request of the defendant, the plaintiff procured a purchaser, and effected a sale of that block, and that it was then agreed that the plaintiff should have for his services therein $300, and gave him a note or memo-

randum in writing for that sum. The same is true for the services rendered in respect to blocks 4 and 19, and for procuring three different loans of money, except as to giving the note, but for which the price was apportioned to each transaction at the time the services were performed. *These were all subjects embraced within the agreements, but which were separately executed and closed, and the amount to be paid agreed upon and apportioned to each one of them. Such contract is not entire, but severable; and a right of action accrued when such services were rendered and ended. It is a familiar principle that the statute of limitations begins to run when the right of action is complete, and this being so a right of action accrued upon each of these matters when the services were rendered and the transaction closed.*" (Italics ours.)

We held in *Ah How v. Furth*, 13 Wash. 550, 43 Pac. 639, quoting from *Graves v. Pemberton*, 3 Ind. App. 71, 29 N. E. 177, that,

" 'Where services are rendered under *an agreement which does not fix any certain time for payment,* nor when the services shall end, the contract of employment will be treated as continuous, and the statute of limitations will not begin to run until the services are ended.' " (Italics ours.)

However, in the case at bar the appellant by his complaint definitely fixed the time for the payment of his claims as of the date when the respondent was "placed in funds or in a position reasonably to obtain funds available for the payment of such compensation." Therefore the statute began to run as soon as the respondent was in the position described. The rule is that,

"Where a contract provides that performance by the promisor shall take place on the happening of a certain event or the fulfillment of a certain condition, the cause of action accrues and the statute begins to run when the event occurs or the condition is complied

with without performance of the promise being made, . . ." 37 C. J. 818.

■ Payments were made to appellant by respondent in 1922, 1923, and 1924 of commissions due upon the Cathcart sales. While these payments brought the Cathcart transaction within the three-year limitation period prior to the commencement of this action, appellant may not successfully urge that such payments start the statute running anew as to the other claims upon which he sued, in view of our holding that the claims were separate and distinct from each other.

The authorities cited in support of appellant's theory are inapposite. Those cases and the case at bar are distinguishable on the facts.

The judgment is affirmed.

MITCHELL, C. J., PARKER, FRENCH, and BEALS, JJ., concur.