[No. 28887. Department One. May 6, 1943.]

W. J. TRETHEWEY *et al., Respondents,* v. GREEN RIVER
GORGE, INC., *Appellant.*[1]

[1]Reported in 136 P. (2d) 999.

698

*Caldwell, Lycette & Diamond,* for appellant.

*Kennett & Benton,* for respondents.

STEINERT, J.—Plaintiffs, husband and wife, brought suit against the defendant corporation to recover the

sum of $10,373.52 claimed by plaintiffs to be the balance of unpaid salary earned by them in operating defendant's business and pleasure resort during a continuous period of seventeen years. Defendant appeared in the action and filed an answer containing a general denial and, in addition, four affirmative defenses pleading payment in full, the bar of the statute of limitations, estoppel against recovery by reason of plaintiffs' alleged mismanagement of the business, and failure on the part of plaintiffs to keep true records and render proper accounting of the moneys and property of the defendant.

After issues had been joined, plaintiffs made demand for a jury trial. On motion of the defendant the demand was stricken, on the ground that the action was one of equitable cognizance. The cause was tried to the court without a jury and, after taking the matter under advisement, the trial court filed a memorandum opinion declaring that plaintiffs were entitled to recover the full amount of their claim. Later, the court signed findings and conclusions presented by the plaintiffs, and at the same time entered judgment as prayed for in the complaint. Defendant thereupon appealed.

The assignments of error are directed, for the most part, against the findings of fact, although certain questions of law are also urged. Fundamentally, two questions are presented for decision: (1) What were the terms and conditions of the contract upon which this action is based? (2) When and how was the contract finally terminated? Upon the first question there is very little, if any, dispute as to the facts; the reason for this is that the evidence on that question was virtually all supplied by respondents and, as will become apparent, appellant was by force of circumstances unable to contradict the verbal testimony offered by respondents. Upon the second, and vital, question

there is violent conflict not only in the verbal testimony, but also with respect to the conclusions to be drawn from the documentary evidence and with reference to the law governing the established facts.

The evidence with reference to the first question, relating to the terms of the contract, was substantially as follows: In the early part of April, 1924, one Linton Treacy, commonly known as Pete Muldoon, together with C. W. Lester entered into a written contract with Dick Craine and Bessie W. Craine, his wife, wherein Treacy and Lester agreed to purchase from the Craines certain real property and the resort business conducted thereon under the name of Green River Gorge, in King county, Washington. The purchase price was thirty thousand dollars, of which four thousand dollars was paid in cash at the time of entering into the contract; thirty-five hundred dollars was made payable on or before May 1, 1924; and the balance was to be paid in substantial monthly installments of varying amounts.

The purchasers under the contract contemplated the formation of a corporation to take over the property and continue the operation of the resort business. Accordingly, Treacy, who appears to have been the moving spirit in the venture, wrote to his sister, Della Trethewey, one of the respondents herein, who with her husband, W. J. Trethewey, the other respondent, was then residing in Michigan, and sought to interest the Tretheweys in purchasing stock in the contemplated corporation and in coming to Washington for the purpose of taking active charge of the resort and conducting its business.

The Tretheweys, being favorably impressed with the proposition, decided to accept it. They therefore sold their home in Lansing, Michigan, and Mr. Trethewey gave up a lucrative position there. Soon after-

wards they moved to Washington. Upon their arrival in Seattle, the appellant corporation, Green River Gorge, Inc., was organized by Linton Treacy, C. W. Lester, and the latter's brother, L. C. Lester. The corporation was capitalized at thirty thousand dollars, representing three hundred shares of capital stock, of the par value of one hundred dollars a share. The three incorporators and Mr. Trethewey subscribed for the entire amount of the capital stock, each agreeing to take seventy-five shares.

At about this same time respondents entered into an oral agreement with the corporation, purporting to fix the terms and conditions upon which respondents were to pay for their stock and undertake the management and operation of the business. The details of the agreement are set forth at length in one of the numbered findings by the trial court, as follows:

"That in 1924 the plaintiff[s] [respondents herein] entered into an oral agreement with the defendant [appellant corporation] whereby they purchased seventy-five (75) shares of the capital stock of said corporation, at $100 per share, or a total sum of $7,500. That under said agreement plaintiffs were required to and did pay $2,600 in cash. That as a part of the agreement of purchase of said stock it was orally agreed that the plaintiffs were to be employed to operate and manage the property of the defendant corporation, which was and is a resort near Enumclaw, Washington, and were to reside on said property and operate and maintain the resort continuously, at a salary of $125 a month and board and room for both plaintiffs; and that the salary so earned by the plaintiffs was to be credited toward the balance due the defendant corporation from the plaintiffs on account of the sale and purchase of said stock. That after said stock had been fully paid for the plaintiffs were to draw their salary from the income of the resort business of the corporation only in the event there were sufficient funds on hand from the earnings of the business, *and that if*

*sufficient funds were not available to pay said salary*
*the amount of the unpaid salary would be carried for-*
*ward from year to year on the books of the company*
*as a running account due the plaintiffs, against which*
*there would be credited such amounts as were drawn*
*from time to time by the plaintiffs."*

We have italicized that portion of the agreement which is of chief concern in this litigation.

The findings as thus quoted were based on the positive testimony not only of the respondents, but also of C. W. Lester, the sole survivor of the three incorporators of the company, although at the time of the trial Lester was no longer a stockholder therein.

Proceeding upon the oral agreement, respondents took charge of the resort, lived upon the property, and operated the business continuously until the spring of 1941, a period of seventeen years. Mrs. Trethewey, with some domestic help, cooked and served the meals, cleaned and took care of the main building and the six or eight cabins maintained by the resort, helped to operate the store and the several stands upon the property, and assisted in beautifying the grounds. During the active season of the year, lasting from about May until October, she was occupied with her work approximately sixteen hours a day. In the slack, or winter, season her work was not nearly so onerous, although she continued to do whatever was necessary to be done in the continued operation of the business.

Mr. Trethewey gave his attention more particularly to the grounds comprising about seventeen acres. He likewise spent long, arduous hours doing the things which the nature of the business required. With the assistance of an employee, he built, or rebuilt, trails, amusement devices, store stands, picnic tables, rest rooms, a garage, and some cabins; cleared weeds and

other vegetation; improved a stream and piped water to various parts of the property; cut and hauled wood; split shakes; parked automobiles; did the marketing; and, to some extent, helped in the store and dining room.

Treacy and the Lester brothers, who at that time were jointly engaged in other enterprises in Seattle and elsewhere, rendered no manual assistance in the operation of the resort and were seldom on the premises. Treacy, however, appears to have exercised a general supervision over the financial affairs of the corporation until his death in 1929. Early in the venture he employed an accountant to open and take care of a set of books for the business. This accountant maintained his connection with the corporation throughout the entire period of this controversy.

Respondents kept a daily record of the receipts and expenditures, including such amounts as they expended for their own personal use. At the end of each year, the accountant would audit respondents' records and post the books so as to show the total receipts and expenses for the year, the total amount of salary earned by respondents, the amount credited to them on their stock subscription, the amount of cash drawn by them, and, finally, by added pencil notations, the amount of credit for unpaid salary to which the Tretheweys were entitled. The books show a continuous, running account from year to year.

The accountant also prepared yearly an income tax return as required by the Federal government. Copies of these returns, appearing as exhibits in the record herein, show that during every year of its operation subsequent to 1927 the business lost money. However, it also appears from the evidence that the Green River Gorge was the only resort in that area whose operation survived the period of depression.

Each of these income tax returns further shows, as an item of expense, salary payable to W. J. Trethewey in the sum of twelve hundred dollars a year. This was a reduction of three hundred dollars from the amount of the original agreement, but that reduction had been suggested and voluntarily made by the Tretheweys themselves in 1928, because of the financial difficulties the corporation was having.

In 1926 or 1927, Treacy acquired the capital stock owned by the Lester brothers, so that Treacy then held two hundred twenty-five shares, and the respondents seventy-five shares. In the fall of 1927, the balance owing the Craines on the real estate contract was paid, and a deed to the property was executed and delivered by the vendors to the appellant corporation. By the end of 1927, also, respondents had paid for their stock in full, through application of their monthly salary together with a cash credit in the sum of six hundred dollars representing an amount received upon a fire insurance policy covering their furniture.

In March, 1929, Linton Treacy died. According to the minute book of the corporation, Treacy was at that time president of the company, respondent Della Trethewey was vice-president, and respondent W. J. Trethewey was secretary-treasurer. The account of W. J. Trethewey, as it appears in the ledger of the corporation, shows that, at the end of 1928, which was prior to Treacy's death, there was a balance of $1,548 owing to Trethewey.

Shortly after Treacy's death, the stockholders held a meeting and elected a board of trustees consisting of Mr. and Mrs. Trethewey and Dorothy Muldoon Treacy, who was Linton Treacy's widow and sole devisee under his will. At a trustees' meeting held at the same time, Mrs. Trethewey was elected president, Mrs. Treacy vice-president, and Mr. Trethewey secretary-treasurer.

Thereafter, the respondents continued to operate the business as before, without any assistance from Mrs. Treacy, who, although she had visited the gorge property from time to time and had access to its books and records, apparently knew very little about the corporation's affairs and seemingly nothing about the terms or conditions of respondents' contract. The relations between her and the respondents appear, however, to have been mutually agreeable and free from any friction during that period. In November, 1929, the Tretheweys paid Mrs. Treacy a dividend of two hundred dollars out of corporation funds, although the record is not clear as to why this was done. It is conceded that this dividend is the only one ever received by Mrs. Treacy from the corporation.

In 1934, Mrs. Treacy moved to California and shortly thereafter married Elmer B. Campbell, her present husband, whom she had known for several years. At the time of Mrs. Treacy's departure from Seattle, the unpaid salary of the respondents as credited on the books had mounted to about five thousand dollars. However, Mrs. Treacy apparently was not cognizant of that fact.

Matters moved along in the manner above described until August, 1936, at which time respondents' unpaid salary, as shown by the books and other records, amounted to almost seventy-five hundred dollars.

Down to this point, the evidence upon which the trial court based its findings of fact is without serious, if any, dispute. In any event, we are convinced that the evidence fully supports the trial court's findings to the effect (1) that the terms and conditions of the contract were as alleged by the respondents and as hereinbefore set forth; (2) that respondents faithfully

performed the services called for by the agreement between them and the corporation; (3) that the amount of unpaid salary owing to respondents in August, 1936, approximated seventy-five hundred dollars; and (4) that the books of the corporation correctly reflect that amount as an unpaid obligation.

We now come to the period which marks the beginning and progress of the real dispute between the parties actually concerned in this action, namely, the Tretheweys, owners of seventy-five shares of capital stock of the corporation, and Mrs. Treacy, now Mrs. Campbell, owner of the remaining two hundred twenty-five shares.

It appears that in 1936 these parties were considering the advisability of selling the resort if the desired price could be obtained therefor. About this same time, Mrs. Campbell learned through her sister in Seattle that the Tretheweys were claiming back salary. Accordingly, in August of that year Mr. and Mrs. Campbell came to Seattle and called on the Tretheweys. The latter asserted their claim for back salary, to which Mrs. Campbell strongly objected. The issue between them thus at once became definite and acute.

Mrs. Campbell then immediately, on August 7, 1936, placed the matter in the hands of her attorney, Mr. John Philip Lycette, a member of the law firm of Caldwell, Lycette & Diamond, which firm, through Mr. Caldwell, had represented Mr. Treacy in his lifetime and had also attended to the probating of his estate.

On August 8, 1936, Mr. Lycette wrote a letter to the Tretheweys, using the stationery of his legal firm. In view of the importance which both parties herein attach to that letter, we quote it in full:

"Mr. W. J. Tretheway                    August 8, 1936
Della Tretheway
Green River Gorge
Black Diamond Post Office
Washington

"Dear Mr. Tretheway:

"Mrs. Dorothy Treacy Campbell has recently given me a general Power of Attorney to act for her in connection with all matters, and a special Power of Attorney to act for her in connection with all of her interests in Green River Gorge, Inc., of which she is the owner of a 75% interest.

"Without regard to the present status of affairs at Green River Gorge, Inc., and without regard to any claims or alleged past arrangements or agreements regarding the operation of Green River Gorge, Inc., *it is the desire of Mrs. Campbell* that from now on, that is to say, as of August 1, 1936, the corporation and corporate property shall be managed on the following basis:

"Mr. and Mrs. Tretheway shall have the right to operate the corporation property of Green River Gorge. They are to keep the taxes on the property and all bills and accounts incurred by them in connection with the business paid up. They shall also keep the property in good repair. Such profits, if any, as they may make over and above said expenses and up to the sum of Twelve Hundred Dollars ($1200.00) per year, they shall be entitled to keep the same as their own in lieu of any salary. All profits above Twelve Hundred Dollars ($1200.00) shall be divided and paid over on the basis of 75% to Mrs. Campbell and 25% to Mr. and Mrs. Tretheway. This shall be the sole and only arrangement between the corporation and Mr. and Mrs. Tretheway.

"For all purposes in connection with the corporation, Green River Gorge, Inc., the address of Mrs. Campbell will be 2003 Exchange Building. Any notices, mail, or any other communication regarding the corporation shall be sent to Mrs. Dorothy Treacy Campbell, in care of John P. Lycette, 2003 Exchange Building, Seattle, Washington.

*"Will you be so kind as to consider the proposition above suggested for the operation of the company's property, and write to me immediately that you have accepted it and that it is the basis of the operation from now on until mutually changed. It is my desire to have this done immediately.*

"It is the desire of Dorothy Treacy Campbell, formerly Dorothy Muldoon Treacy, as owner of 75% of the voting stock, and as a director of the corporation, that a special meeting of the stockholders be held, and a request is hereby made for such a meeting. We would therefore like to have the meeting called by the Secretary, and due notice thereof sent to Mrs. Campbell at the address above given.

"I am signing this letter in my individual capacity as the holder of a general Power of Attorney from Mrs. Campbell, and also signing it on behalf of Mrs. Campbell.

"At the meeting requested to be held directors of the corporation should be elected.

"Kindly let me hear from you at your very earliest convenience, or arrange to see me at my office.

*"I am sure that everything can be fixed up in an entirely friendly and satisfactory manner.*

"Sincerely yours,

"John P. Lycette

. Attorney-in-fact for

Dorothy Treacy Campbell

"JPL ez      Dorothy Treacy Campbell

By John P. Lycette

her attorney in fact."

(Italics ours.)

On the day preceding the writing of that letter, Mrs. Campbell had executed a general power of attorney and also a special power of attorney to Mr. Lycette, as stated in his communication to the Tretheweys. It will be noted that the letter written by Mr. Lycette as attorney in fact for Mrs. Campbell simply expressed the *desire* of Mrs. Campbell with reference to the future operation of the resort, and the *request* on her

part through Mr. Lycette that the Tretheweys *consider the proposition therein suggested,* and her further request that a meeting of stockholders be called for the purpose of electing trustees. In other words, the letter merely expressed the wishes and request of Mrs. Campbell, a stockholder; it was not a demand by or on behalf of the corporation itself.

The Tretheweys did not reply to that communication, and it is not contended by appellant that Mr. or Mrs. Trethewey ever directly accepted, either orally or in writing, the proposition made by Mr. Lycette. The acceptance which appellant now asserts and relies upon is an alleged course of conduct to which we shall refer in more detail a little later.

Having engaged the services of Mr. Lycette, Mrs. Campbell and her husband returned to California and, so far as the record discloses, did not visit Seattle again until sometime in the summer of 1941.

On August 10, 1936, Mr. Lycette, on behalf of Mrs. Campbell as holder of seventy-five per cent of the stock of the corporation, sent the Tretheweys a formal notice of a meeting of stockholders to be held in his office on August 24th. Pursuant to that notice, Mr. and Mrs. Trethewey went to Mr. Lycette's office and a meeting, or meetings, of some kind was, or were, held, although there is a decided conflict in the testimony as to what was said and done on that occasion.

Mr. Lycette testified that, at the meeting of August 24th, three trustees, or directors, of the corporation were elected, consisting of himself, his partner, Josef Diamond, and Mrs. Trethewey; that thereafter officers of the corporation were elected, consisting of Mrs. Trethewey as president, Mr. Trethewey as vice-president and treasurer, and Mr. Lycette as secretary; that the election of these officers was by unanimous vote; that Mr. Diamond and Mr. Lycette then purported to

act as trustees of the corporation; that a discussion thereupon took place among the parties present regarding the Tretheweys' salary account and the matters contained in Mr. Lycette's letter of August 8th; that he then and there told the Tretheweys flatly that he would not agree to any back salary and that so far as any future salary was concerned, the Tretheweys could continue to run the place, pay the bills and taxes, and have their living expenses, and that if the company made any profit they could keep therefrom an amount up to twelve hundred dollars a year as salary; that he further told them that unless they agreed to his proposition he, as representative owner of seventy-five per cent of the stock, and he together with Mr. Diamond as directors, would compel the Tretheweys to leave the place, and that this was the only condition on which the latter could remain; and that the Tretheweys appeared to be agreeable to his proposition, but that they still wanted to "tie in the back salary."

Mr. Diamond testified that on one occasion only did he attend a meeting between Mr. and Mrs. Trethewey and Mr. Lycette, but he could not recall the exact time, although he thought it was the meeting of August 24th. He had never met the respondents before. He was not present at the election of trustees and did not know until afterwards that he had been elected to that office. He stated that he was in and out of the room during the general discussion on that day and did not see or hear everything that took place on that occasion. Mr. Lycette had previously testified that the stockholders' meeting and the trustees' meeting were one, and that Mr. Diamond came in during a part of the discussion after he had been elected trustee. Mr. Lycette's characterization of the general meeting may be summed up in his own words that "we did have an election of officers in a most informal manner." How-

ever, Mr. Diamond corroborated Mr. Lycette's further statement that the future piling up of salary by the Tretheweys was to be immediately terminated, and that the latter raised no objections to the conditions laid down by Mr. Lycette as to future obligations.

The corporate books of the appellant contain no minutes of any stockholders' meeting or trustees' meeting held on or near August 24, 1936. Mr. Lycette produced at the trial what he testified was a carbon copy of such minutes, prepared by himself shortly after the date above mentioned. He admitted, however, that his penciled signatures thereto were placed thereon after the commencement of this action in 1941.

The purported minutes of the stockholders' meeting recited an election of trustees and a general discussion of the affairs of the corporation, particularly with reference to the relationship of the Tretheweys to the corporation, their claimed account for back salary, and the matter of their future compensation. The purported minutes of the trustees' meeting recited the election of officers by mutual agreement; a discussion concerning the future salary of the respondents; an agreement that, after August 1, 1936, there should be no guaranteed salary arrangement with the Tretheweys; and the adoption of a formal resolution, as fully set forth in the purported minutes, upon the terms outlined in Mr. Lycette's letter of August 8th. No testimony at the trial, however, indicated that such resolution was acted upon by the trustees.

It further appears from the testimony of Mr. Lycette and Mr. Diamond that the originals of these minutes, together with an oath of office for signature by Mrs. Trethewey and a proposed contract of employment of the Tretheweys embodying the terms previously set forth in Mr. Lycette's letter of August 8th, were prepared by Mr. Lycette and given by him to

Mr. Diamond for delivery to the Tretheweys, who had been told on the day of the meeting to come back for them; that the Tretheweys did return a few days later, received the papers, and made no objections to the minutes or to the proposed employment agreement, except that they were not certain that the agreement protected their back salary claim. They did not, however, sign the proposed contract, nor return the original copies of the minutes.

Appellant introduced in evidence an oath of office as director, signed by Della Trethewey, and a similar instrument signed by John P. Lycette and Josef Diamond. Neither of these "oaths" was dated, sworn to, or incorporated into the minute book.

On cross-examination, Mr. Lycette was asked what his purpose was in drawing the purported minutes and the proposed contract, which were delivered to the respondents, and his answer was: "The purpose was to set the statute of limitations in motion." He was then asked: "Did you convey that to the Tretheweys?" He answered: "I don't think so. I didn't say so in so many words."

The respondents' testimony with respect to these transactions with Mr. Lycette was in some respects quite different from the testimony of Mr. Lycette and Mr. Diamond. Moreover, the testimony of Mrs. Trethewey differed from that of her husband to some extent.

She testified that no meeting, as called for by Mr. Lycette's notice of August 10th, was ever held; that, when she and Mr. Trethewey appeared at Mr. Lycette's office on August 24th in response to the notice, Mr. Lycette was reported to be out of town and that Mr. Diamond submitted to them at that time a proposed agreement which had already been prepared, and asked them to sign it; that she thereupon asked, and

was granted, permission to take the proposed agreement with her; that she later submitted the instrument to an attorney who suggested certain changes therein; that Mr. Lycette thereafter emphatically refused to consider any changes in the agreement as proposed; and that therefore she and her husband would not sign it. A carbon copy of the proposed agreement appears in the record, but it bears no date, nor is it signed by anyone.

Mrs. Trethewey also testified concerning conversations had by her with Mr. Lycette with reference to the salary question. Those conversations, however, she said were limited solely to the disputed question as to whether or not the Tretheweys actually had a contract with the corporation as claimed by them; the question of future salaries, she said, was not discussed in those conversations.

Mr. Trethewey testified that, at the meeting held in Mr. Lycette's office, the date of which he could not remember, only Mr. Lycette, Mrs. Trethewey, and himself were present; that Mr. Diamond was not present: He denied that any election of officers was held at that time, although he understood that Mr. Lycette had been "appointed" secretary by Mrs. Campbell. He testified that at this meeting a proposed new contract with reference to future salaries was discussed, but that he would not agree to sign it because Mr. Lycette refused to recognize the unpaid back salary. He denied that Mr. Lycette had told him or his wife that they could continue at the gorge only on the basis of the proposed new agreement. His testimony on that point was:

"Q. [by Mr. Lycette] Did I not tell you at that time that unless you would agree to that agreement regarding future salary, you could not stay there? A. No, you did not. I would have gotten out of there, I would have been on WPA."

Whatever may have been said or done at the meeting of August 24th or in the immediate succeeding days, it is certain that no agreement was reached at that time, and the record is utterly silent as to any further conferences or communications between Mr. Lycette and the respondents for over a year thereafter. However, during that subsequent period of more than a year, the record discloses that the Tretheweys continued to operate the gorge property in the same manner as before, and that the books were kept and reports made according to the same method as had previously obtained.

Nothing further occurred until November 2, 1937, on which date the firm of Caldwell, Lycette & Diamond, through Mr. Lycette, wrote to the respondents, stating that Mrs. Campbell was anxious to have a report on how matters stood at the resort, and further requesting an early meeting at Mr. Lycette's office for the purpose of going over the accounts. Pursuant to that letter a meeting as requested was held on November 10th. Persons present were Mr. Lycette and the Tretheweys; Mr. Diamond was not there. Concededly, it was not a trustees' meeting. What was said and done at that meeting is again a matter of serious dispute, and the minute book contains no record of it. Mr. Lycette testified that a general discussion was had, in which the salary question was again brought up; that the respondents still insisted on their back salary; and that he told them that if they stayed it would have to be on the same terms as had been proposed and "agreed to the year before."

Respondents of course denied that there had been any agreement. Mr. Trethewey testified that they discussed, among other things, the salary question, which "was usually the main bone of contention." He further testified that Mr. Lycette did not at that time,

nor at any other time, say with any positiveness that if respondents remained at the resort it would have to be on terms of a reduced salary.

Shortly after that meeting, Mr. Lycette wrote a letter to the respondents, a carbon copy of which appears in the record and reads as follows:

"November 13, 1937

"Dear Mr. and Mrs. Tretheway:

"I am writing this letter as a sort of resume or followup of our meeting on November 10th, 1937. At that time Mr. W. J. Tretheway and Della Tretheway and the writer, John P. Lycette, representing all of the stock of Green River Gorge, Inc., were present at the office of the Secretary, John P. Lycette, at 2003 Exchange Building, in the City of Seattle.

"At that meeting we discussed the affairs of the corporation at considerable length and reviewed the financial affairs of the company during the past year.

"It was agreed that we should consider that as a meeting of the corporation's stockholders. The same directors are to be considered elected for another year. The same officers will remain for another year, that is to say, Della Tretheway, President; W. J. Tretheway, Vice-President; and John P. Lycette, Secretary. The former provisions concerning the making of contracts and agreements and/or the sale and mortgage of the property shall remain the same. No contract or agreement, sale, mortgage, loan, or other transaction, save and except everyday business transactions, shall be valid unless set forth in writing and signed by the President and Secretary.

"We discussed the matter of selling the property or offering it for sale and you were going to cooperate with me in an effort to make a sale of the property along the lines and terms we mentioned, that is to say, $27,500.00 on terms or $24,500.00 cash with a reduction in these prices if it looks proper or favorable at the time of any proposed sale.

"Inasmuch as the making of a sale is not at all certain, and since it is rather likely that you will continue to operate the place during the coming year and season,

it is understood that if you operate, it will be on the basis of the terms set forth in my letter to you of August 26th, 1936, and the contract which I sent to you about that date.

"It is further to be understood that the moneys which you receive by way of salaries this year, shall be salary for the period during the past year, and that there is no connection between these moneys so paid or received by you or any other moneys received during that period, and any claimed back salary that you might have against the company. In other words, anything you received last year or anything you may receive or take during the coming season shall not be understood as constituting a payment upon any back salary, nor shall it be included as a payment on account. Such payments for last year and the coming year shall stand entirely by themselves as separate and independent transactions. *If this is not satisfactory, the matter must be brought to a head immediately and we, as controllers of the majority of the stock, and Mr. Diamond and I, being the majority of the Board of Directors, will take some other definite course.* Your continuance will be construed as a consent to the terms of this letter.

"You are in no way committing yourself as to whether you have a claim for back salary or do not have one by anything that may occur from now on, nor are we in any way committing ourselves as to the legality of any such claim. You know my position on that point, and there is no need to say more about it. *We can go along and cooperate in every way to try to make something out of the place for you and for Mrs. Campbell. We can do that either by operating the place or by a sale.*

"I would like to have you send me the pictures or postal cards that we discussed, so that I can try to get out an attractive booklet to endeavor to sell the place. I will submit the booklet to you for your consideration and suggestions.

"Sincerely yours,<br>"CALDWELL, LYCETTE & DIAMOND

JPL ez      By............................................." (Italics ours.)

In response to that letter, Mr. and Mrs. Trethewey together with an attorney, Mr. Harold Anderson, called on Mr. Lycette. According to Mr. Lycette's testimony, the discussion that then took place was with reference to both back salary and future arrangements; that Mr. Anderson insisted that respondents should be paid their back salary; and that he, Lycette, took a contrary position and reiterated the former terms on which respondents would be permitted to continue operation of the resort. It is not contended that this conference was either a stockholders' meeting or a trustees' meeting, and it is conceded that Mr. Diamond was not present.

Although Mr. Lycette, according to his testimony, expected that respondents would immediately start a lawsuit as a result of that conference, none was instituted. In fact, nothing of any moment whatever occurred, and the situation remained exactly as before. The Tretheweys continued to operate the resort for over two years thereafter without further contact or correspondence with either Mr. Lycette or Mrs. Campbell. The books were kept and income tax returns were made in the same manner as before, showing both an annual loss and a mounting unpaid salary obligation owing to the respondents. The income tax returns for 1937 to 1940, inclusive, all show deductible items of expense in the sum of twelve hundred dollars, as yearly compensation to W. J. Trethewey.

In the spring of 1941, Mr. and Mrs. Campbell moved to Washington, and matters at once began to take very definite shape. On April 2nd, Mr. Lycette sent out notices of separate meetings of stockholders and of trustees to be held on April 4th. Stockholders present at that meeting were Mr. and Mrs. Trethewey, E. B. Campbell, and Mr. Lycette representing Mrs. Campbell. The following persons were elected and took the oath

of office as trustees: Della Trethewey, E. B. Campbell, and John P. Lycette.

At the trustees' meeting immediately following, a resolution was formally adopted removing Mr. and Mrs. Trethewey as officers of the corporation and electing the following: E. B. Campbell, president; Dorothy Treacy Campbell, vice-president and treasurer; John P. Lycette, secretary.

On April 14th another meeting of trustees was held and Mr. Trethewey was restored to his former office of treasurer. At the same meeting, a resolution was formally adopted fixing a salary of $12.50 a month for each of the Campbells and each of the Tretheweys; in addition, these parties were all to receive living quarters, light, heat, and food from the corporation, according to past custom with respect to those operating the resort. This resolution received the votes of Mr. Campbell and Mr. Lycette only; the respondents did not vote but expressed their opposition thereto. It was further stated at the meeting by Mr. Campbell and Mr. Lycette that any moneys paid to the respondents would constitute a new account and should in no way be considered as applying on claimed back salaries. A discussion was then had concerning respondents' claim, and both Mr. Campbell and Mr. Lycette declared that they would not recognize such claim; that the claim was not well founded; and that in any event *it was barred by the statute of limitations.* This was the first time that respondents were definitely advised that their claim was subject to the operation of such statute.

Respondents remained on the property for a period of one month after that meeting, helping the Campbells in the operation of the resort, and then quit on or about May 15th. They commenced this action in July, 1941.

In February or March, 1942, while the action was pending, the regular accountant for the corporation

made up the 1941 income tax return. The return shows accounts payable in the total amount of $10,494.74, of which, according to the trial balance sheet thereto attached, $10,388.02 was owing to W. J. Trethewey. This salary account was represented to the United States government as a liability of the corporation.

The accountant testified that after he had prepared the return he submitted it to the Campbells and they seemed to think it was all right. He and the Campbells then signed the return, and Mr. Lycette notarized it.

We have seemingly gone to an extraordinary length in reciting the main portions of the evidence. Even so, we have not covered it all. Nothing less than a reading of the entire statement of facts, covering three hundred sixty pages, together with approximately one hundred written exhibits, can convey a full understanding of the details of this controversy.

█ Appellant's first contention upon the appeal is that respondents' contract of employment, made in 1924, was simply an agreement under which appellant was to pay respondents a stipulated amount per month. If this contention be sustained, then the statute of limitations would bar recovery of all sums coming due prior to three years before July 12, 1941, the date of the commencement of the action.

However, as we have already indicated, the evidence shows and the court found, that if sufficient funds were not available to pay respondents' salary, under the terms of the agreement the unpaid amounts were to be carried forward on the books of the company, from year to year as a running account, against which were to be credited such amounts as were drawn by respondents from time to time. The contract of employment was for an indefinite period, the services rendered thereunder by respondents were continuous, and the items of charge and credit were periodically entered

each year; hence the statute of limitations did not begin to run until the services were terminated. *Ah How v. Furth,* 13 Wash. 550, 43 Pac. 639; *Morrissey v. Faucett,* 28 Wash. 52, 68 Pac. 352; *Sibley v. Stetson & Post Lbr. Co.,* 110 Wash. 204, 188 Pac. 389; accord: *Perry v. Hillman,* 153 Wash. 689, 280 Pac. 346; see, also, *Gensman v. West Coast Power Co.,* 3 Wn. (2d) 404, 101 P. (2d) 316.

Appellant's second, and principal, contention is that, in any event, respondents' contract of employment was definitely terminated in August, 1936; that a new agreement was then entered into which provided that respondents should be paid their salary only out of the current year's net profits, and that unpaid salary should not accumulate on the books of the company from year to year; that more than three years have elapsed between the making of the new agreement and the commencement of this action; and that therefore recovery for any salary claimed to have been earned under the old agreement and prior to the time of the new one is barred by the statute of limitations.

The trial court made findings of fact, the substance of which, so far as is material upon the question under consideration, is as follows: Pursuant to the oral agreement of employment, respondents worked continuously until April 14, 1941. During that period there was not sufficient income from the business to pay respondents' salary in full. In accordance with the terms of the agreement, the monthly salary due the respondents each year was entered upon the books of the appellant corporation, and against such salary account were credited the amounts they actually withdrew from time to time. In closing its corporate books each year during the period here involved, the appellants showed respondents' salary account as an obligation of the corporation. The amount so shown as due and owing to the respondents is $10,373.52.

The court further found that the appellant corporation had failed to sustain the burden of proof on the issue of payment in full, or on its affirmative defense that the action had not been commenced within the time limited by law.

The court then made a series of findings which bear most directly upon the particular question now under consideration, as follows:

After acquiring ownership of seventy-five per cent of the capital stock of the corporation, Mrs. Campbell made no attempt to change the salary arrangement until 1936. In August of that year she attempted, through Mr. Lycette, to induce respondents to enter into a new salary agreement, but respondents in their negotiations with Mr. Lycette and at all times steadfastly refused to enter into such agreement unless they were first protected in the matter of their back salary. On August 8, 1936, Mr. Lycette issued a call for a stockholders' meeting, and at that meeting, at which respondents were present, Mr. Lycette, Mrs. Trethewey, and Mr. Diamond were elected directors. Neither Mr. Lycette nor Mr. Diamond, however, ever signed an oath as director or qualified as such. In November, 1937, another meeting was held in Mr. Lycette's office, at which he and the respondents only were present. No executed corporate minutes of either of these meetings were kept, but an unexecuted carbon copy of the minutes of the meeting in August, 1936, was offered in evidence purporting to show a new salary arrangement between appellant and respondents, identical in terms with the proposed agreement which previously had been submitted to, and rejected by, the respondents. In November, 1937, also, Mr. Lycette informed respondents by letter that if they continued on in the management of the resort business it must be under the terms suggested in his letter of August 8, 1936.

Respondents thereafter continued on in the management of the property, and nothing further was done with reference to changing their salary arrangement until April 14, 1941. On that day, a stockholders' meeting was duly called and held, and Mrs. Campbell, Mr. Lycette, and Mrs. Trethewey were elected and qualified as directors. Thereafter, on the same day, by resolution duly adopted, the salary of respondents was reduced to twenty-five dollars a month. Appellant was at all times advised of respondents' refusal to acknowledge termination of their original contract and the creation of a new contract, and was put to no disadvantage or loss upon a belief or supposition that the respondents had consented to a termination of the old salary and the creation of a new one. Based on these findings, appropriate conclusions were entered.

Thus, the court found and concluded: (1) that, although Mrs. Campbell and Mr. Lycette made repeated attempts to induce the Tretheweys to terminate the original contract by entering into a new one, the Tretheweys emphatically refused to do so, and no express new agreement was ever consummated; (2) that, although at the stockholders' meeting of August 8, 1936, Mr. Lycette and Mr. Diamond were elected trustees of the appellant corporation, no valid corporate action was taken resulting in the termination of the old contract or the creation of a new one, until April 14, 1941; and (3) that appellant was at all times well aware of respondents' continuous refusal to enter into a new contract and therefore could not assert an estoppel against the respondents on the ground that by their acts they had put appellant to a disadvantage and loss in believing that respondents had agreed to a termination of the old contract and the substitution of a new contract.

The first of these findings as just enumerated is over-whelmingly supported by the evidence in the case, and the third not only follows as a conclusion there-from, but also is established by the evidence. We therefore will devote no further time to either of those questions, but will confine ourselves solely to the second enumerated finding.

As previously stated, the trial court found that no valid corporate action was taken, prior to April 14, 1941, to terminate the old contract. It appears from the court's memorandum opinion that the reason for so holding was that, although Mr. Lycette and Mr. Diamond were elected trustees of the corporation on August 24, 1936, they failed to sign an oath of office and therefore never became legally qualified to act as trustees.

The by-laws of the corporation provide that trustees shall hold office until the next annual meeting of the stockholders, or until their successors are elected and *qualified*. The laws of this state in force at the time the by-laws were adopted required that the trustees of corporations take and subscribe to an oath. Chapter 172, Laws of 1919, p. 512 (Rem. Comp. Stat., § 3812).

Subsequently, in 1933, the legislature of this state adopted the uniform business corporation act, chapter 185, Laws of 1933, p. 770, which was amended by chapter 143, Laws of 1939, p. 425. Subsections I and III of the original act, which were not amended and now appear as Rem. Rev. Stat. (Sup.), § 3803-31 [P. C. § 4503-131] subsections I and III, deal with the qualifications of directors of corporations. Subsection I provides that a director shall hold office for the term for which he was named or elected and until his successor is elected and qualified. Subsection III provides:

"The number, qualifications, terms of office, manner of election, time and place of meeting, and the powers and duties of the directors may, subject to the provisions of this act, be prescribed by the articles or by-laws."

Nowhere in the uniform business corporation act is it specifically provided that a director must take or subscribe to an oath. The act of 1919, referred to above as requiring an oath, was not expressly repealed, however, until 1939.

Whether or not, under the law as it obtained in this state on and after August 24, 1936, trustees or directors of corporations were required to take an oath in order to qualify for office, may thus well be a debatable question. However, in view of the conclusions which we have reached herein, it is not necessary to decide that question, and, for the purposes of this case, we shall assume that no oath was necessary, and that consequently Mr. Lycette and Mr. Diamond were qualified trustees of the corporation on the day last mentioned.

The question to be decided, then, is whether the original contract was legally terminated by corporate action of the appellant. Mrs. Campbell, as a mere stockholder, of course, could not terminate it, nor could Mr. Lycette, acting either as her legal attorney or as her attorney in fact, do so. The power of management of the corporate affairs and the power to contract so as to bind the corporation is vested primarily in the board of directors and not in the stockholders; the principal rights of the latter, in ordinary business or trading corporations, are to attend and vote at corporate meetings, to pass and amend by-laws, to elect directors, to participate in dividends and profits, and to receive their proportionate shares of the corporate property or its proceeds upon dissolution and winding up of the corporation after payment of

its debts. See 18 C. J. S. 1156, Corporations, § 482; 19 C. J. S. 80, Corporations, § 742; 4 Cook on Corporations (8th ed.), 2907, § 709; 13 Fletcher, Cyclopedia of Corporations, 29, § 5717; 3 Thompson on Corporations (3d ed.), 907, § 2224.

■ Although a majority stockholder has the ultimate power to dictate the business policy of a corporation and to control its business affairs, he can exercise that power only through his ability to elect directors who will carry out his wishes and instructions. Subsection I of § 31 of the uniform business corporation act (Rem. Rev. Stat. (Sup.), § 3803-31) reads, in part, as follows: "The business of every corporation shall be managed by a board of at least three directors, . . ." Mr. Lycette as attorney in fact for Mrs. Campbell, a stockholder, had no power, prior to his election as trustee, if at all, to terminate respondents' existing contract.

■ Furthermore, Mr. Lycette had no additional authority as a director by virtue of his being the representative of the majority stockholder. *Clement v. Young-McShea Amusement Co.*, 70 N. J. Eq. 677, 67 Atl. 82, 118 Am. St. 747; *Danglade etc. Mining Co. v. Mexico-Joplin Land Co.*, 190 S. W. (Mo. App.) 35.

In 13 Am. Jur. 909, Corporations, § 948, it is said:

"As a consequence, a single director of a corporation as such has no power to act in a representative capacity for the corporation; nor has he general authority to make contracts for the corporation, and there is no presumption that a contract purporting to be made by him was authorized by the corporation, even though he owns a majority of the corporate stock."

■ It is equally certain that Mr. Lycette, as secretary of the corporation, had no power by virtue of that office alone to cancel the contract of the Tretheweys. The by-laws of appellant corporation did not give the

secretary power to enter into or cancel contracts. The Washington cases cited by appellant on this phase of the case are not in point. Only two of those cases deal with the power of the secretary of a corporation to enter into contracts on its behalf, and those two concern factual situations where third parties sued a corporation, and the corporation was held bound by the acts of the secretary under the doctrine of apparent authority, closely akin to estoppel. Such is not the case here.

The case of *New York Alaska Gold Dredging Co. v. Walbridge,* 38 F. (2d) 199, also cited by the appellant, adds nothing to the argument. The Federal court did not rule upon the question as to the power of the secretary of the corporation, but ordered the case remanded for submission to the jury on the question whether an oral agreement was reached between the manager of the corporation and its secretary and board of directors. The court in fact said that "in so important a matter as employment of a general manager and superintendent, the board of directors of the corporation should act."

The only authority that Mr. Lycette could have and exercise in the matter of terminating respondents' contract would be by virtue of a resolution or some other appropriate official action taken by the board of trustees. The evidence convinces us that no such action was ever taken. Assuming that Mr. Lycette and Mr. Diamond were duly elected and qualified trustees at that time, the board then consisted of those two individuals and Mrs. Trethewey. It is apparent to us from the record that Mr. Diamond did not function as a trustee at the meeting of August 24th. He did not even know that he had been elected such until afterwards. He was "in and out of the

room" while the discussion between Mr. Lycette and the Tretheweys was taking place. He was at best but a witness to a fragmentary part of the conference. It is certain that he exercised no discretion and had no voice in the subject under consideration.

Mr. Lycette and Mrs. Trethewey were of course opposed to each other on the question and hence no united action was taken by those two. Moreover, if Mrs. Trethewey be considered as having been disqualified to act upon a matter in which she was interested, then Mr. Lycette was the only competent acting director. But if Mrs. Trethewey be eliminated, then there was no quorum of directors, and no action at all could be taken.

It is well settled that the power to do particular acts and the general authority to manage the corporate affairs is vested in the trustees or directors, and their acts are binding only when done as a board and at a legal meeting.

The law upon the subject is so well stated in 2 Fletcher, Cyclopedia Corporations (Perm. ed.), § 392, p. 168 *et seq.*, that we quote therefrom at some length:

"By the overwhelming weight of authority, when the power to do particular acts, or general authority to manage the affairs of the corporation, is vested in the directors or trustees, it is vested in them, not individually, but as a board, and, as a general rule, they can act so as to bind the corporation only when they act as a board and at a legal meeting, unless the corporation has estopped itself, or has ratified the acts of the individual directors by receiving and accepting the benefits of their acts adopted in such manner, and this rule applies to the meetings of the board of directors of banking corporations. The rule and the reasons therefor are well stated in a federal decision by Judge Neterer as follows: 'The stockholders of a corporation have a right to expect from their directors a con-

scientious consideration of every proposition which is presented which involves any interest of the company, in conformity to the oath which they have subscribed. They have a right to have the individual viewpoint of the several directors expressed at a conference, for the purpose of obtaining the exchange view of the several persons in arriving at conclusions after deliberate consideration of any issue. It is fundamental that officers of boards can only act as such constituted boards when assembled as such, and by deliberate and concerted action dispose of the issue under consideration, and that they cannot act in an individual capacity outside of a formal meeting, and a majority of the individual expressions be the action of the board. The law believes that the greatest wisdom results from conference and exchange of individual views, and it is for that reason that the law requires the united wisdom of a majority of the several members of the board in determining the business of a corporation.' 'It is the board duly convened and acting as a unit that is made the representative of the company. The assent or determination of the members of the board acting separately and individually is not the assent of the corporation. The law proceeds upon the theory that the directors shall meet and counsel with each other, and that any determination affecting the corporation shall only be arrived at and expressed after a consultation at a meeting of the board attended by at least a majority of its members.' [*First Nat. Bank v. Drake,* 35 Kan. 564, 11 Pac. 445, 57 Am. Rep. 193.]"

We conclude, therefore, that, from any point of view, Mr. Lycette was without authority to terminate respondents' existing contract. If, however, we should assume that he did have such authority, we are of the considered opinion that he did not effectually exercise it. Appellant's theory, and the ground upon which it must prevail, if at all, is that the statute of limitations was set in operation by, and at the time of, Mr. Lycette's declarations to the Tretheweys that the old con-

tract was terminated and that future arrangements were to be governed by a new set of conditions.

A careful study of the record convinces us that Mr. Lycette did not positively, explicitly, or unequivocally declare that the old contract was terminated, but, rather, dealt with the Tretheweys in such a manner as to lead them to believe that the matter of changing the terms of the contract was a subject of adjustment by mutual agreement. Never until April 14, 1941, when the three-year period had safely passed, did Mr. Lycette intimate to the respondents that time was running against their alleged claim. On the contrary, they were allowed to remain upon the premises and conduct the business in the belief that no change in the agreement had been accomplished. As stated before, Mr. Lycette's purpose was to start the running of the statute, although, as he conceded, he did not convey that thought to the respondents. The trial court in its memorandum opinion summarized the situation thus:

"Both parties were sparring, the defendant [appellant] awaiting the coming of the statute, the plaintiffs [respondents] hanging on, admitting little and signing nothing. . . .

"The corporation, by affirmative action, could have terminated the old contract, stood suit for what it owed the plaintiffs, if anything. It elected to take no action of such final character. I must conclude the defendant *hoped time would cure an embarrassing situation.*" (Italics ours.)

It is quite understandable, also, why appellant considered that course expedient and likely to be advantageous. The Tretheweys were on the premises and had conducted the business ever since the corporation was organized. The Campbells were in California and could not give the resort the needed attention. It was

desirable that the Tretheweys remain and continue the operation, at least until the property could be sold or until the Campbells could move to Washington and take over the management. To bring the relationship to an abrupt end by explicitly terminating the contract and removing the Tretheweys would leave the resort without care and attention. It would also, in all likelihood, at once precipitate an action by them on their claimed contract, with at least a fair chance of success if the court should hold, as it did, that there actually was such a contract as they claimed.

In these circumstances, it was deemed the better part of discretion to temporize, and thus not only have the needed presence of respondents and their continuing efforts, but also have the statute of limitations operating against their claim, then standing at seventy-five hundred dollars and continuously mounting. We have no criticism of the course pursued in the attempt to forestall, or if need be defeat, what the Campbells and Mr. Lycette himself undoubtedly, and with some reason perhaps, thought was an unjust claim. But we are equally certain that the course pursued, however well conceived and skillfully conducted, did not legally accomplish its purpose.

In the early part of this opinion we adverted to the fact that the most recent income tax return, executed by Mr. Campbell in 1942, and notarized by Mr. Lycette, shows an existing obligation of $10,388.02 owing by the appellant corporation to the respondents. While we do not agree with the respondents' contention that the income tax return constituted, in law, an acknowledgment in writing of the debt, sufficient to remove the bar of the statute, we do think that it is a factor to be considered on the question of whether or not appellant recognized the continued existence of respondents' con-

tract. In view, however, of the length to which this opinion has already gone, we will not discuss the legal questions presented by the litigants on that subject.

The judgment is affirmed.

SIMPSON, C. J., MILLARD, JEFFERS, and MALLERY, JJ., concur.

