[1] Reported in 205 P.2d 597.
In this action, the plaintiff, Superior Portland Cement, Inc., a Washington corporation, sought specific performance of a provision contained in a lease wherein the defendant, Pacific Coast Cement Company, a Washington corporation, was lessor and plaintiff lessee, or, in the alternative, for damages on account of alleged breach of contract by the defendant.
During the year 1931, the parties to this action were each in the business of manufacturing cement. Plaintiff's plant was located at Concrete, Washington, and defendant's (referred to as the "Diamond" plant) at Seattle. The defendant also owned and operated a limestone quarry on Dall Island, Alaska, from which it procured limestone which it used in the manufacture of cement. The defendant transferred *Page 172 
the limestone from Alaska to Seattle by a ship known as the "Diamond Cement," which was owned by Pacific Coast Coal Company, a New York corporation.
While the defendant herein is a Washington corporation, all of its stock is owned by Pacific Coast Cement Corporation, a Florida corporation, which has two classes of stock, common and preferred, and, until August, 1947, the greater portion of the capital stock of the latter corporation (almost eighty-seven per cent of the common stock and a little more than ninety-three per cent of the preferred stock) was owned by Pacific Coast Company, a New Jersey corporation. The remaining shares of the capital stock of the Florida corporation were in various ownerships. Pacific Coast Coal Company is a New York corporation, all of its capital stock being owned by Pacific Coast Company (of New Jersey).
From the foregoing, it is clear that Pacific Coast Company (of New Jersey) controlled a larger interest in the business of the defendant herein, Pacific Coast Cement Company, a corporation, than all other stockholders combined.
In this opinion we shall refer to the foregoing corporate entities as follows:
 Superior Portland Cement, Inc., a corporation, as plaintiff (or appellant).
 Pacific Coast Cement Company, a corporation, as defendant (or respondent).
Pacific Coast Cement Corporation, as Florida Cement.
 Pacific Coast Company, a New Jersey corporation, as New Jersey Pacific.
 Pacific Coast Coal Company, a New York corporation, as New York Pacific.
In the defendant's business operations prior to 1931, it made use of the limestone quarry on Dall Island, Alaska, the ship "Diamond Cement" owned by New York Pacific, and defendant's plant for the manufacture of cement (known by the trade name "Diamond Cement") at Seattle. These three items, forming one operation, were frequently referred to by the owners as "the package." *Page 173 
During the month of June, 1931, defendant, by a thirty-seven-page written agreement, leased its Seattle cement manufacturing plant (including real property), and the defendant's interest in the placer mining claims upon which is located the Dall Island quarry, to plaintiff for the term commencing July 1, 1931, and ending June 30, 1936, plaintiff to operate the properties and pay defendant, as rental, a sum equal to forty per cent of the profits derived from the quarrying, manufacture, and sale of cement manufactured at plaintiff's plant at Concrete and defendant's leased plant at Seattle, defendant to transport the lime rock from Dall Island to Seattle at an agreed rate per ton.
In the lease agreement the plaintiff herein is referred to as "Superior," and the defendant as "Pacific."
By the lease agreement the lessee, plaintiff herein, was granted
"31. . . . an unconditional option to extend this lease for a further period of five (5) years from the expiration date hereof.. . . all of the terms and conditions of this lease without change shall be in full force and effect between the parties hereto as the lease on said premises for said period of time, except there shall be no extension beyond June 30, 1941.
"In the event of the exercise of this option for extension, all of the covenants, agreements and other provisions of this lease shall apply to the extended term and inure to the benefit of, and be binding upon Pacific and Superior, and except as to the dates shown in this paragraph 31 above all dates herein shall be automatically applied to fit such five year extension.
"32. In consideration of one dollar and of the premises, Pacific agrees that if at any time or times during the term of this lease or during the five year period of extension, if extended, Pacific decides to sell, subject to this lease, the premises described in first and/or second of the granting clause herein and the personal property connected with and constituting a part of its plants, it will give to Superior Portland Cement, Inc., the first right and privilege of purchasing the same at the price it is willing or at any time or times offers to sell to others and upon the same terms and conditions. Superior shall have thirty days from date of receipt from Pacific of written offer to sell in which to accept *Page 174 
the same, by writing delivered to Pacific, in default of which the offer shall be deemed rejected."
In paragraph No. 23 of the lease appears the following: "This lease may be continued for such additional term as the parties hereto may by mutual agreement determine." There follows a provision that appellant should notify respondent on or before July 1, 1935, of its desire to extend the term of the lease. Naturally, the provision of the lease just quoted primarily referred to the extension provided for in the lease, but the language quoted is not limited by its terms to that particular extension.
At the time of the execution and delivery of the lease agreement above referred to, New Jersey Pacific (the parent organization), by letter, accorded to plaintiff the privilege of purchasing its stock in Florida Cement in case New Jersey Pacific should decide to dispose of its stock in that corporation.
With the exception of some modifications not here important, the lease of June 1, 1931, was subsequently, from time to time, by mutual agreement of the parties, renewed and maintained in full force and effect until December 31, 1946, during which period plaintiff paid to defendant thereunder an amount aggregating over $6,400,000.
The plaintiff herein instituted this action, February 21, 1947, by filing its complaint, alleging the execution of the lease agreement above referred to and the extension thereof, by mutual agreement of the parties, to December 31, 1946, and that the plaintiff thereafter, in accordance with the agreement, surrendered possession of the leased properties to the defendant.
That up to the last mentioned date, all provisions of the lease applied to the extended terms thereof and were binding upon plaintiff and defendant. Plaintiff further alleged that, prior to December 31, 1946, the defendant had decided to sell the cement plant and the other leased properties. That on or about August 8, 1946, defendant orally offered to sell these properties to plaintiff for the sum of $2,500,000, which offer was not accepted by plaintiff, and *Page 175 
that no other offer of sale of the properties was ever communicated to plaintiff by defendant. That defendant negotiated with other parties for the sale and purchase of the properties, receiving offers and making counter offers, without informing plaintiff of any such negotiations.
That, during the fall of 1946, General Construction Company, a corporation (hereinafter referred to as General), and others, negotiated with defendant for the purchase of the leased properties and that defendant, having decided to sell these properties for a sum less than the price at which they were offered to plaintiff, did not further negotiate with plaintiff.
That, promptly upon termination of the lease, defendant received a formal offer from General for the purchase of the properties, in the sum of $1,170,240.90, plus certain book costs and inventories, and soon thereafter formally accepted that offer.
That plaintiff protested to defendant and was informed that the properties would be sold to General, whereupon plaintiff made written demand upon defendant to sell the properties to plaintiff on the same terms and conditions pursuant to which defendant agreed to sell to another, plaintiff being ready and willing to pay to defendant the price at which defendant had agreed to sell the properties to General, and that the defendant had failed to inform plaintiff of the offers it had received, the counter offers which defendant had made, or the price which defendant was asking for the properties. That defendant thereby prevented plaintiff from exercising its right to purchase the properties upon the same terms and conditions as defendant offered to others.
Plaintiff prayed that the defendant be required to abide by the provisions of paragraph No. 32 of the lease as extended, and that this portion of the lease be specifically performed. Plaintiff also prayed that, in the event specific performance could not be had, plaintiff recover damages from defendant. Plaintiff also demanded equitable relief.
Plaintiff having supplemented its complaint by a bill of particulars, defendant answered, admitting the execution *Page 176 
of the lease and its extension to December 31, 1946, denying the other material allegations of plaintiff's complaint, and by an affirmative defense, pleaded its stock ownership as hereinafter set forth, admitting that it had received an offer of purchase of the properties and alleged that, at a meeting of the board of directors of the corporation we designate as New Jersey Pacific, held in New York City, January 6, 1947, those directors recommended to Florida Cement and the defendant corporation that the properties be sold for $1,170,240.90 cash, plus inventory adjustments, and that the steamship "Diamond Cement" be sold for $79,759.10, plus cost of repairs, and that the appropriate officers of the corporation be authorized to proceed accordingly.
Defendant further alleged that plaintiff was estopped from making any claim against defendant as alleged, and that plaintiff was not financially able to effectuate the purchase of the properties, and prayed for dismissal of the action. By plaintiff's reply the issues between the parties were completed.
Prior to the trial, plaintiff's complaint was amended in certain particulars, defendant filing its answer to the amendments.
The action came on regularly for trial before the court sitting without a jury, April 6, 1948, and, April 22, 1948, the court signed its decree dismissing the action with prejudice and awarding defendant its costs. The decree contains the following provisions:
"It is further HEREBY ORDERED, ADJUDGED and DECREED, in conformity with an oral stipulation between counsel in open court during the course of the trial, that in the event of a reversal of this decree by the Supreme Court of this state, this Court shall retain jurisdiction for the purpose of hearing testimony with reference to the reasonable amount of the plaintiff's attorney's fees, and, in addition thereto, receiving supplemental evidence affecting the amount of the purchase price to be paid for the cement properties of the defendant."
From this decree plaintiff has appealed, making the following assignments of error: *Page 177 
"1. The court erred in holding that it was necessary for the respondent to first obtain the approval of two-thirds in amount of the stockholders of the decision of the management to sell the properties before appellant's first right of refusal would ripen under the provisions of paragraph 32 of the lease.
"2. The court erred in not holding that there had been a decision by respondent to sell within the provisions of paragraph 32 of the lease prior to its expiration, which would ripen the appellant's option rights under said paragraph.
"3. The court erred in not holding that paragraph 32 of the lease had been breached by respondent.
"4. The court erred in not decreeing specific performance, and in dismissing the action with prejudice."
The three corporations, respondent, Florida Cement, and New Jersey Pacific, have been and are closely associated. All three maintained one general office in Seattle, with a common office force. Apparently, the office expenses were pooled and arbitrarily divided. The same persons acted as directors of Florida Cement and respondent. G.W. Mertens was president of each corporation, and H.M. Watkins held a similar office with each. Basic matters of policy to be adopted by respondent were determined by directions from the board of directors of New Jersey Pacific. Respondent paid to New Jersey Pacific money by way of management fees.
William Tudor Gardiner, a resident of Maine, has served as chairman of the board of directors of New Jersey Pacific since 1932 (save for portions of the years 1944-45), and owns or controls a substantial portion of the stock of that company. Mr. Gardiner is frequently referred to in the record (generally as "Governor Gardiner"), and evidently has been very influential in controlling the business affairs of New Jersey Pacific.
The negotiations between appellant and respondent, which resulted in the execution of the lease and accompanying agreements, were conducted on respondent's behalf by Mr. Gardiner. The proposed contracts having been approved by the board of directors of New Jersey Pacific, *Page 178 
the board, May 26, 1931, expressly authorized the officers of the corporation to consent to the inclusion in the lease of the following provision:
". . . that if, at any time or times during the term of the lease, or any extensions thereof, the Pacific Coast Cement Company decides to sell its property, it will give Superior Portland Cement, Inc., the first right and privilege of purchasing the same at the price it is willing and offers at that time to sell to others, and upon the same terms and conditions."
In paragraph No. 31 of the lease, as executed, there was granted to appellant "an unconditional option to extend this lease for a further period of five (5) years from the expiration date hereof."
Apparently, during the existence of the lease, all negotiations in connection therewith were, on respondent's behalf, conducted by Mr. Gardiner, he having also conducted the negotiations which led up to the execution of the lease. Called as an adverse witness by appellant, Mr. Gardiner testified as follows:
"Q. In fact, you own or represent more Common stock than all of the rest of the directors combined, do you not? A. I should think so. Q. Governor, you were, were you not, the principal representative of the defendant in this action during the last ten or fifteen years in all important negotiations with Superior relating to the lease or extensions of it? A. The defendant in this action is the Cement — Q. I mean the plaintiff in this action, Superior. THE WITNESS: Would you read the question, please. (Question reread) Q. (By Mr. Little) I am not trying to be technical but you were the representative were you not? A. I represented the parent company in negotiations regarding this lease. Q. Were the principal negotiations with the plaintiff, the Superior Portland Cement Company, carried on with any of the men here in Seattle? A. No; I should say that I carried on the negotiations. Q. You were the principal in the negotiations? A. That is right."
During the month of November, 1945, Mr. Gardiner, who was then in Seattle, discussed with C.N. Reitze, vice-president of appellant, matters concerning a further extension of the lease. As the result of these negotiations, the *Page 179 
lease was extended from June 30, 1946, to December 31, 1946. The board of directors of New Jersey Pacific, December 27, 1945, ratified this short extension of the lease, as shown by its records, as follows:
"The Chairman further reported, and the Board approved, a suggestion made on behalf of the Pacific Coast Cement Company to the effect that the date of termination of the present lease be extended to December 31, 1946, with no commitment on the part of the lessee to operate the Dall Island Quarry during the year 1946."
During the year 1945, it occurred to Mr. Gardiner that it would be advisable for the corporations concerned to dispose of their northwestern cement interests, or, as he stated, to sell the entire "package," consisting of the Diamond plant in Seattle, the Dall Island quarry, and the ship "Diamond Cement." This idea was strengthened when Mr. Gardiner received from an appraisal firm a report concerning the cement properties, which stated with conclusion that a sale or merger thereof would be preferable to a lease. Mr. Gardiner mentioned his thought to E.P. Lucas, president of appellant, with whom Mr. Gardiner had negotiated the original lease and the extensions thereof, mentioning the matter also to Mr. Reitze. Mr. Gardiner stated that a short term lease would not be satisfactory, and that he would prefer to sell the properties, or possibly effect a merger with appellant.
The matter of a sale of the properties was also discussed with Mr. McEachern, president of General Construction Company, and with E.E. Trefethen, Jr., vice-president of Permanente Cement Company, the two latter corporations being controlled by eastern parties, referred to as "Kaiser interests."
Mr. Gardiner proposed a sale for $2,500,000 for the "package." He also discussed the matter of a sale with other persons. Messrs. McEachern and Trefethen displayed interest in the matter, but were of the opinion that the price asked was too high.
When Mr. Gardiner visited Seattle in August, 1946, he met Harry H. Smith, a member of a Los Angeles contracting *Page 180 
firm, who registered interest in the properties. Mr. Gardiner quoted to Mr. Smith the same price that he had stated to others, and, as Mr. Smith testified (his deposition having been taken by appellant):
"A. The Governor informed me he was chairman of the Board of Directors, that if we could arrive at a deal that he felt that he was competejt to speak for the bulk of the people owning it and to deliver the plant. We went into that very carefully because we didn't want to spend a lot of money and find out we couldn't make a deal, the people we were talking to weren't authorized to make a deal. Q. Was any reference made concerning any provisions of the lease with Superior Portland Cement Company which might have a bearing upon a sale? A. The reason for delivery on January 1st was the fact that the Superior Portland Cement had the plant leased, and in the lease there was a certain option — which the lease was later delivered to me and our attorneys went over it very carefully — giving the Superior Portland Cement the option to buy, the first refusal, I think the option is worded. I have forgotten the technical wording of it. Q. Well, what, if anything, did Mr. Gardiner say with reference to the questions as to whether Superior had any first right of refusal under your negotiations? A. Well, he said that they had that right. He told me they had, quite frankly, that Superior had the first refusal to buy the plant; that he was of the opinion that they didn't care for it; Mr. Lucas was in ill health; the labor problems weren't too easy with them; and that he was under the impression that Mr. Lucas was going to turn the plant back to them on the first of the year. They were not organized and didn't have the organization to operate it, and consequently they were looking for a sale, and that was the purpose of his meeting at 8:30 or 9:00 o'clock that morning, was to determine with Mr. Lucas what his plans were for the following year, and we had an appointment for later in the day."
Mr. Smith later testified:
"A. The Governor subsequently called me on the phone from some place in Maine and explained that he could not give me a written firm option in any event due to this — to the fact that Superior would still have a refusal that they would have — he would have to be released of, but he would give me a gentleman's agreement that I could, — that he felt confident I could act on, because his information from Mr. Lucas was that Superior would not be interested in it at *Page 181 
the price of $2,500,000 and that he would sell us the plant provided Superior didn't take it."
The directors of New Jersey Pacific met in New York, September 5, 1946, when the board adopted the following resolution:
"RESOLVED, that William Tudor Gardiner, Richard P. Windisch, and William Carnegie Ewen be, and they are hereby, appointed a committee with full powers for and on behalf of The Pacific Coast Company to cooperate with the officers and Board of Directors of The Pacific Coast Company and the Pacific Coast Coal Company in the matter of investigating, considering and determining the best course to follow with respect to the disposition of the plant, quarry and related properties of the Pacific Coast Cement Company and the Steamship DIAMOND CEMENT owned by the Pacific Coast Coal Company, which disposition shall embrace the possibilities of a sale or a lease or a merger with some other corporation, or the self-operation of said properties in whole or in part.
"RESOLVED FURTHER, that the said Committee shall have all of the powers of the Board of Directors of this Company necessary to carry on their duties as aforesaid to a final conclusion and to make on behalf of this company a recommendation to the respective Boards of Directors of Pacific Coast Cement Company and Pacific Coast Coal Company with respect to the aforesaid properties."
Mr. Gardiner testified that the committee referred to in the resolution was appointed as a "negotiating committee," and that it was vested with very broad powers in order that, when discussing the matter with possible purchasers, they might negotiate with authority.
Mr. Smith testified that he visited New York during September, 1946, when he was advised of the appointment of the committee, and that the members of the committee could control over ninety per cent of the stock of Florida Cement, which corporation held all of the stock of respondent. Mr. Smith also testified that he was assured that the committee referred to could speak with authority, stating:
"A. They assured me that the number, the stock that they controlled together with the number of seats upon the Board of Directors, there was no question. That was the deal." *Page 182 
Mr. Smith also testified that it was understood that, before a sale could be made to the interests represented by Mr. Smith, the matter should be discussed with appellant's representatives.
After further negotiations, Mr. Smith, by letter, submitted to respondent an offer of two million dollars, a few days later raising this offer, adding fifty thousand dollars. Mr. Gardiner testified that this offer was acceptable, the only difficulty being that Mr. Smith was unable to finance the deal.
During the month of November, Mr. Gardiner again visited Seattle, where he communicated with Mr. McEachern by telephone, learning that General would not pay more than $1,750,000, and that only for a straight sale of the properties. While in Seattle, Mr. Gardiner called upon Mr. Reitze and discussed with him four or five alternative propositions, the parties reaching no agreement upon any of them. Mr. Gardiner suggested an extension of the lease for three months, which was not satisfactory to Mr. Reitze, who stated that he had heard some rumors of the negotiations with Mr. Smith and General Construction. Mr. Gardiner testified that, in a conversation with Mr. Reitze, about November 24th, he might have told Mr. Reitze that Mr. Smith had not been able to raise the money necessary to finance the transaction.
The witness further testified that, some time previously, he had been "quite discouraged" at Mr. Smith's failure, but that, later, he "had great hopes that Smith would raise money."
Mr. Reitze testified that, at this conversation, Mr. Gardiner had told him that the deal with Smith "was off, out the window, and he was `as free as a bird now,'" and that Mr. Gardiner then told him that the price quoted to Smith was two and one-half million dollars, and that Mr. Gardiner did not advise him that the properties had been offered to Smith at a lower figure.
After his return to New York, Mr. Gardiner wrote Mr. McEachern the following letter (which was admitted in evidence with respondent's consent): *Page 183 
"Mr. J.A. McEachern November 30, 1946 General Construction Co. 3840 Iowa Street, West Seattle, Washington
"Dear Mr. McEachern:
"I am sorry that it was impossible to complete arrangements for a conference in Seattle December 3 and 4, but I am very glad that Mr. Richard P. Windisch will be able to be in Seattle Sunday, December 8 for a time that should be adequate for discussion. Unfortunately it is impossible for me to be there that week. Mr. Windisch has been a Director of The Pacific Coast Company for many years and has a substantial interest in the Company. He and Mr. Ewen and myself constitute a sub-committee of the Board of Directors with authority to negotiate regarding the Cement Plant. Mr. Windisch has full authority to speak for me, not only as to this but as to all Company matters. He will communicate with you after his arrival in Seattle. It is expected that Mr. Seward of our New York counsel will be with him. Yours very truly,
"WTG:K
"Copy to Mr. Mertens:
"The above is self explanatory. I have written out for Mr. Windisch all the information I think will be helpful and have assured him that you and the others will give him the greatest cooperation. W.T.G."
It should be observed that "Mr. Mertens" was the president of respondent Florida Cement and New Jersey Pacific.
A few days later, Mr. Windisch, accompanied by his New York counsel and Mr. Watkins, who was secretary, treasurer, and auditor for the three corporations referred to, visited Seattle and renewed negotiations with Mr. McEachern and other representatives of the Kaiser interests. After several meetings, December 10, 1946, Mr. McEachern submitted a final "take-it-or-leave-it" offer to purchase the cement properties at the price of $1,250,000, to be paid in cash, the offer to be accepted by January 1, 1947. This offer was for a conveyance of the "package," including the Seattle plant and the Alaska quarry, owned by respondent, and the steamship "Diamond Cement" owned by New York Pacific. During these negotiations, Mr. Windisch was in frequent contact with Mr. Gardiner by telephone. *Page 184 
Just prior to the meeting with Mr. McEachern, at which the latter submitted his final offer, Mr. Windisch and Mr. Watkins called on Mr. Reitze, Mr. Lucas, the president of appellant, being sick and confined to a hospital. Mr. Reitze testified that, during this conversation, a renewal of the then existing lease for several years was discussed; conditioned, however, on the part of respondent, that such renewal should be subject to sale of the leased properties at any time. Messrs. Windisch and Watkins, in their testimony, denied that any such condition was suggested. Mr. Reitze stated that, in view of the restriction which was included in the offer by Mr. Windisch, the proposition was not acceptable to appellant.
At no time during the conference with Mr. Reitze was the latter informed concerning the pending negotiations with Mr. McEachern, or the parties which he represented. There is no testimony to the effect that this latter offer was in writing. It appears that Mr. Windisch and Mr. McEachern met again, December 14th, when, at the former's suggestion, the offer was extended until January 10, 1947. The following day, Mr. Windisch returned to New York.
It appears that, after his return, the board of directors of New Jersey Pacific met in New York City, the minutes of the meeting containing the following:
"The Chairman reported that the Committee appointed to consider and make recommendations concerning the disposition or future operation of the plant, quarry, and related properties of Pacific Coast Cement Company and of the Steamship DIAMOND CEMENT owned by Pacific Coast Coal Company, was not yet able to make its recommendations."
Concerning this meeting of the board, Mr. Gardiner testified:
"Q. Did you at this meeting, Governor, make any reference to what negotiations had taken place to date, before the meeting of the Board? A. No. Q. Nothing was said about any negotiations that had taken place? A. I don't recall any. The Minutes record the formal action that was taken, — that we were not ready to report; and I think that was all. . . . Q. Governor, you testified you have nine *Page 185 
members of your Board? A. That is right. Q. You have testified that at the meeting on December 19th, you made no other statement or report other than that set forth in the minutes which have been introduced in evidence, — the report? A. That is right. Q. To how many of your nine directors did you — or to your knowledge, Mr. Windisch — explain the status of the negotiations which had transpired after Mr. Windisch returned? A. Have you got a period of time in there? Q. After Mr. Windisch returned to New York and before the end of the year, — at or about the time of this Board meeting on December 19th? A. I have no clear recollection about that. I would have talked to those directors whom I met. Q. Well, who did you meet, if you recall? A. Well, that is pretty difficult, — because Mertens was not in the East. There were eight in the East. Q. You talked to most of your directors about the offer which Mr. Windisch brought back with him, did you not? A. Very likely. I am not sure. Q. You didn't tell, however, Mr. Henry Brooks did you, one of your directors? A. I didn't talk to Brooks unless necessary. . . . Q. Governor, between the time that Windisch returned to New York with this offer of $1,250,000 from General Construction Company, and the meeting of January 6th, were there any further communications or negotiations by phone or by letter or otherwise between General Construction and Pacific? A. No. That was a take-it-or-leave-it proposition. Q. In other words, the negotiations as such had been completed and it was up to you to take it or leave it? A. That is right. Q. Neither you nor anyone on your behalf, after Windisch returned, endeavored to get any changes or modifications in the terms? A. We discussed whether we would form a counter-offer, but we never submitted one."
Meanwhile, Mr. Smith again appeared on the scene, testifying that he had been informed by respondent's Seattle counsel that he (Smith) was out of the picture. December 14th, Smith wired Mr. Gardiner as follows:
"Since Pauley lost the election and withdrew I have negotiated with the Transamerica group through Mr. Nourse of Los Angeles for the purchase of your properties for me. Mr. Combs of the Bank of America is in Seattle checking the deal now. This deal can be closed before the first of the year. Your arrangements with Windisch to take over does not interfere with my deal but the statements that I am completely out do. This wire is your assurance *Page 186 
that if you make any deals other than one with or through me that I haven't any claim on your company, but I want your people to give me full cooperation to close my deal so I can pay you the full cash price you ask.
"HARRY H. SMITH"
Mr. Gardiner wired his answer to Smith, December 16th, as follows:
"Retel Saturday Seattle people uninformed anything pending although attorney Green saw Combs Seattle Friday regarding entirely different matter stop we do not consider we have yet any definite information justifying denial of statement that you are out stop presume Windisch now in New York Directors meet there Thursday.
"W.T. GARDINER"
Concerning these telegrams last mentioned, several witnesses testified, their testimony not being entirely in accord. Mr. Combs, referred to in Smith's wire, did visit Seattle and made some inspection of respondent's properties. By December 30th, it was apparent that neither Smith nor Transamerica would make any offer for respondent's properties.
The directors of New Jersey Pacific met in New York City, January 6, 1947. The committee, which had previously been appointed to consider the matter of the disposal of the properties belonging to respondent, reported, recommending that the offer by General Construction Company (hereinafter referred to as General) to pay $1,250,000 for the properties be accepted. All of the directors, with the exception of director Henry M. Brooks, voted in favor of accepting General's offer. The deposition of Mr. Brooks, which had been taken at appellant's instance, was published during the course of the trial and read into the record.
Mr. Brooks testified that he was a stockholder in New Jersey Pacific, that he had been president of the corporation from 1932 to 1935, and a director from 1931 to 1947, that he owned no stock in appellant. That he had attended all of the meetings of the board of directors of respondent held during the year 1946, and during January and February of 1947, save a meeting held September 5, 1946. That, at the *Page 187 
directors' meeting held in New York, September 19, 1946, no offer for respondent's properties on the part of General was presented, nor were the amount, terms, or conditions of any such offer revealed at that meeting.
That the witness first learned of such an offer during the latter part of December, 1946, "following the return of the committee members from the coast." That the witness was present at the directors' meeting held January 6, 1947, and that, according to his recollection, all members of the board were present, with the exception of Mr. Mertens. That, at this meeting, the chairman, Governor Gardiner, presented General's offer to purchase the properties belonging to respondent. The witness then testified as follows:
"The Chairman advised the Board that discussion of the proposal of the General Construction Company to purchase the assets of the Pacific Coast Cement Company was not brought to the attention of the Board until that time because The Pacific Coast Company was restricted in the sale of the cement properties until December 31st, 1946, because any acceptance of an offer before that date would require Superior's consent."
The witness then testified that a discussion of the offer received was "very extensive, covering all phases, including the desirability or the undesirability of its acceptance," and that the witness opposed the acceptance of the offer.
Mr. Gardiner testified that, after the director's meeting held, January 6, 1947, at which meeting the majority of the board voted to accept the offer referred to, the witness gave instructions to complete the deal with General as soon as possible because he "assumed this deal was going through," later stating that he "had no reason to anticipate any difficulty of any kind."
Messrs. Gardiner and Windisch both testified that, until January 3, 1947, neither had decided to recommend the sale for $1,250,000.
January 30, 1947, a formal agreement was entered into between respondent and New York Pacific on the one part, and General Construction Company on the other, whereby the first two corporations named agreed to sell respondent's *Page 188 
properties and the steamship "Diamond Cement" to General. A special meeting of respondent's board of directors was held, January 30, 1947, at which a resolution was adopted, referring the matter of the ratification of the sale to respondent's stockholders.
Appellant's officers obtained notice of the call of this meeting, thereby becoming informed of the sale of respondent's properties to General, as above set forth.
Appellant's officers then gave to respondent and the other interested corporations formal notice of its objection to the sale to General, claiming that, under the option granted to appellant by the lease, appellant had the right to purchase respondent's properties at the price for which it had been agreed by respondent and the interrelated corporations to sell the properties to another.
At the meeting of respondent's stockholders, held February 21, 1947, certain stockholders objected to the sale to General, calling attention to appellant's contentions that appellant was entitled to purchase the properties at the price fixed for the sale to another. The majority of the stockholders, however, adopted a resolution approving the sale.
February 21, 1947, this action was instituted by the filing of appellant's complaint in the office of the clerk of the superior court, and the filing of a lis pendens in the office of the county auditor.
During the course of the trial of this action, appellant paid into the court the sum of $750,000, which, added to the $50,000 previously so paid, it was contended, would amount to the purchase price to be paid in the event that the court should order specific performance of the option contract.
By its memorandum opinion, the trial court, in effect, found that respondent never decided to sell its properties during the term of the lease; that such a decision on the part of the corporation could have been made only by action of its board of trustees or directors; and, further, that, as the transaction amounted to a sale of all of respondent's assets, the right to sell could only finally be determined by two-thirds of respondent's stockholders. *Page 189 
For convenience, we repeat the pertinent portions of paragraph No. 32, supra, of the original agreement between the parties to this action:
"32. In consideration of one dollar and of the premises, Pacific [respondent] agrees that if at any time or times during the term of this lease or during the five year period of extension, if extended, Pacific decides to sell, subject to this lease, the premises described . . . it will give to Superior Portland Cement, Inc., [appellant] the first right and privilege of purchasing the same at the price it is willing or at any time or times offers to sell to others and upon the same terms and conditions. Superior shall have thirty days from date of receipt from Pacific of written offer to sell in which to accept the same, by writing delivered to Pacific, in default of which the offer shall be deemed rejected."
The first question to be considered is: Was paragraph No. 32 of the lease agreement still in force in 1946, after the expiration of the original five-year term of the lease and the first five-year extension thereof?
The second question presented is: Did respondent decide to sell the properties prior to the expiration of the extended lease, December 31, 1946, and, if respondent did make such a decision, was the option effective only if the decision was to sell the properties "subject to" the lease, or did the agreement also apply to a decision to complete the sale of the properties after the termination of the lease agreement?
By paragraph No. 31 of the original agreement, supra, respondent granted to appellant an unconditional option to extend the lease for a further period of five years, agreeing that, upon the exercise of such option by appellant, the lease should be extended for five years from the termination of the term thereof and that, during the period of extension,
". . . all of the terms and conditions of this lease without change shall be in full force and effect between the parties hereto as the lease on said premises for said period of time, except there shall be no extension beyond June 30, 1941."
The paragraph concludes:
"In the event of the exercise of this option for extension, all of the covenants, agreements and other provisions of this *Page 190 
lease shall apply to the extended term and inure to the benefit of, and be binding upon Pacific and Superior, and except as to the dates shown in this paragraph 31 above all dates herein shall be automatically applied to fit such five year extension."
In paragraph No. 23 of the lease agreement between the parties, it was provided that
"This lease may be continued for such additional term as the parties hereto may by mutual agreement determine; provided that Superior shall notify Pacific on or before July 1, 1935, of its desire to extend the term of this lease."
This paragraph, of course, was followed by paragraph No. 31, granting an option to extend the term of the lease for another five-year period.
Appellant's exhibit No. 16 consists first of a letter directed to appellant, dated June 2, 1931, the day following the date of the lease agreement (which was acknowledged by the corporate officers, June 2, 1931), which reads as follows:
"Gentlemen:
"In consideration of one dollar paid by you to the undersigned, The Pacific Coast Company agrees that if at any time or times during the term of that certain lease between Pacific Coast Cement Company, as Lessor, and Superior Portland Cement, Inc., as Lessee, dated June 1, 1931, covering the cement plants of the Pacific Coast Cement Company, or during the five year period of extension (if extended), The Pacific Coast Company decides to sell its stockholdings in Pacific Coast Cement Corporation, it will give Superior Portland Cement, Inc. the first right and privilege of purchasing the same at the price it is willing and offers to sell to others, and upon the same terms and conditions. Superior Portland Cement, Inc. shall have thirty days from date of receipt from the undersigned of written offer to sell to accept the same by writing delivered to the Pacific Coast Company, in default of which the offer shall be deemed rejected. Yours truly, "THE PACIFIC COAST COMPANY "By [signature illegible] "Vice Pres't and Gen'l Mgr. "Attest: [signature illegible] "Assistant Secretary" *Page 191 
Attached to this letter is a carbon copy of a certificate, signed by the secretary of New Jersey Pacific and attested by the corporate seal, certifying that it is a true and correct extract from the minutes of the meeting of the board of directors of New Jersey Pacific, held, May 26, 1931. The certificate begins by referring to the contemplated agreement between New Jersey Pacific and appellant, and continues, "upon motion duly seconded, it was unanimously resolved" that arrangements made with appellant as the result of previous negotiations, including a lease agreement with changes as might be approved by appellant, be approved and confirmed; and further resolved that necessary action be taken by the parties to execute the contemplated agreement in substantially the form presented to the meeting, and to consent to such changes as might seem advisable, and
". . . specifically, to consent to a provision giving to Superior Portland Cement, Inc., an option to extend the lease for an additional term of five years, and a further provision that if, at any time or times during the term of the lease, or anyextensions thereof, the Pacific Coast Cement Company decides to sell its property, it will give Superior Portland Cement, Inc., the first right and privilege of purchasing the same at the price it is willing and offers at that time to sell to others, and upon the same terms and conditions." (Italics ours.)
Of course, the lease agreement, as executed, constitutes the agreement between the parties. The previously expressed intention of the board of directors of New Jersey Pacific has some possible significance in connection with the interpretation of the agreement as signed.
It must always be borne in mind that the option granted to appellant was not a simple option to purchase at a fixed price. It was an option to become effective when, as, and if respondent, during the existence of the lease, should decide to sell the properties covered thereby. Respondent's decision to sell during the term of the lease is the basis upon which appellant's right rests. Necessarily, a sale of the properties by respondent to appellant, during the term *Page 192 
of the lease, would terminate the lease. The phrase "subject to this lease," as contained in the option agreement, should not be held to limit appellant's right to be advised of respondent's decision to sell, made during the term of the lease, only to a decision on the part of respondent to sell to another "subject to this lease."
The question to be determined is: Did respondent decide to sell during the period appellant's lease was still in force, and, if such a decision was made, was respondent obligated to notify appellant of that fact and grant to appellant thirty days after such notice within which to exercise its option and purchase the property, by paying the price at which respondent was willing to sell, or the price at which respondent had offered to sell to another?
In 51 C.J.S. 643, Landlord and Tenant, § 84, the matter of the time within which a lessee shall exercise an option to purchase, contained in a lease, is discussed. As to an expressed limitation on the time within which an option to purchase may be exercised, appears the following text:
"Where the lease specifies the time for exercising an option to purchase, the option may be exercised within such time, and must be so exercised unless the lessor, by waiver, or otherwise, has precluded himself from relying on the date originally specified."
In the case at bar, it clearly appears that appellant's lease was, from time to time, extended by formal written agreements, until December 31, 1946. No question is here presented as to a mere holding over by a tenant under a lease. There can be no question but that respondent's officers and agents all considered that appellant's option to purchase remained in full force and effect until the date last mentioned. Respondent offered to sell the properties to appellant at $2,500,000, which offer appellant refused, whereupon respondent's officers continued to negotiate with other prospective purchasers, finally deciding to sell, all the time refraining from notifying appellants of the fact that respondent had decided to sell at a price less than that quoted to appellant. *Page 193 
 [1] The right of First Refusal is defined in 51 C.J.S. 631, § 80, as follows:
"First Privilege of Purchasing
"a. In general
"A provision giving the lessee the first privilege of purchasing is valid and binding, and ordinarily constitutes a covenant running with the land. Such a provision, of itself, does not give the lessee a binding `option,' since the lessor has the right to retain the property and not sell to anyone.
"By the provisions of the lease, the first privilege of purchasing may be conferred on the lessee, in which case the lessor must offer the premises to the lessee before selling it to others unless the lessee has waived his right or has lost it in some other manner. The validity of such provisions has been upheld. Under such an agreement the lessor reserves the right of retaining the property and not selling to anyone, so that the lessee's privilege of purchasing depends on the lessor's election to sell. Ordinarily the consideration for the privilege of purchasing is not separate from the consideration for the lease as a whole."
In Restatement, Property, 2441, § 413, is found the following:
"Preemptive Provisions.
"(1) A promissory restraint or forfeiture restraint on the alienation of a legal estate in land which is in the form of a provision that the owner of the estate shall not sell the same without first offering to a designated person the opportunity to meet, with reasonable expedition, any offer received, is valid, unless it violates the rule against perpetuities."
This right is referred to in Restatement, Property, 2318, § 393f.
See, also, 32 Am. Jur. 279, § 299; 127 A.L.R. 900, annotation.
The right is referred to in the following cases: Chandler Co. v. McDonald-Weber Co., 215 Mass. 365, 102 N.E. 319;Cloverdale Co. v. Littlefield, 240 Mass. 129, 133 N.E. 565;R.I. Realty Co. v. Terrell, 254 N.Y. 121, 172 N.E. 262;Buddenberg v. Welch, 97 Ind. App. 87, 185 N.E. 865; Lewis v.Ludlam, 115 Misc. 347, 189 N.Y. Supp. 636. *Page 194 
The right of first refusal, or option, is also referred to inRoth v. Snider, 25 Wn.2d 514, 171 P.2d 819. The facts in the case cited differ from those in the case at bar, but the case is of interest in connection with some phases of the case at bar.
The case of Jurgensen v. Morris, 194 App. Div. 92, 185 N.Y. Supp. 386, concerned a lease which contained the following provision:
"`And the said parties of the first part agree that in the event of their desire to sell the above mentioned property, before the expiration of this lease, that the party of the second part shall have the first option to purchase.'"
In construing the provision, the court said:
"The decision apparently found that the said covenant in the lease did not obligate the defendants to sell to plaintiff, and the respondents' brief here so contends; and the comment of the learned trial justice indicates that that was his view. I do not agree with that view. I think that the covenant was based upon a sufficient consideration, namely, the covenants on the part of the tenant; and that it obligated the defendants, if they wished to sell to another person during the term, to give the plaintiff the opportunity to take the property upon the same terms; in other words, that it required the defendants after receiving the Keiser offer to offer the property to plaintiff upon the same terms. The case of Bullock v. Cutting (155 App. Div. 825) appears to me to be precisely in point, except the covenant there in said option of buying `at the price which first parties [the landlord] desire to sell.' That much, to my mind, is fairly implied in the term used, `first option.'"
In Schroeder v. Gemeinder, 10 Nev. 355, appears the following:
"The first question in this case involves a construction of the covenant giving appellants the first privilege of purchasing the leased premises. What does this covenant mean? It must be so construed as to carry out the real intention of the parties at the time of signing the lease."
In the case of Hayes v. O'Brien, 149 Ill. 403, 37 N.E. 73, 23 L.R.A. 555, the supreme court of Illinois held that, pursuant to an agreement in a lease which reserved to the lessor the *Page 195 
privilege of selling a portion of the leased premises at any time, but further provided that
"`. . . no such sale of said land shall be made by said first party without first having given said second party the privilege of purchasing said land upon such terms and at the same price per acre as any other person or purchaser might have offered therefor,'"
conferred upon the lessee the right to purchase at a price offered by another if the lessor decided to sell at that price. The court called attention to the fact that the provision of the lease above referred to did not obligate the lessor to sell, but was effective to accord the lessee the right to purchase if the lessor desired to sell at an offered price.
Similar questions concerning the right of the lessee to exercise a "first refusal," a "preferred option," or "pre-emption," have been considered in Hudson Amusement Co. v.Smith, 65 N.E.2d 881; In re Rigby's Estate, 167 P.2d (Wyo.), 964; Burleigh v. Mactier, 108 Atl. (N.J.) 84; Driebev. Fort Penn Realty Co., 331 Pa. 314, 200 A. 62,117 A.L.R. 1091; Peerless Department Stores v. George M. Snook Co.,123 W. Va. 77, 15 S.E.2d 169, 136 A.L.R. 130.
In the cases above cited, the right of a first refusal granted to a lessee was, generally speaking, upheld.
The supreme court of New Hampshire, in the case of RobinsonCo. v. Drew, 83 N.H. 459, 144 A. 67, considered a question similar to that here presented. The option clause in the lease considered by the court read: "`and that in case of a sale of the block by the lessors, the lessee shall have the preference as a purchaser.'" The lessor decided to sell the property during the term of the lease and offered to sell to the lessee at a price the lessee declined to pay. Later, the lessor sold the property at a lower price, without first giving the lessee an opportunity to purchase at that price. The trial court dismissed the action. The order dismissing the action was reversed. In the course of the opinion, the supreme court said:
"The fair and reasonable meaning of the clause is that if the lessor should decide to sell during the term, he would give the lessee the first chance to buy at the price he asked. *Page 196 
Decision to sell meant decision on the price to be asked. Any other construction would make the clause ineffective, and since the parties intended an effective meaning, one that is ineffective is not to be preferred. . . .
"The lessor's offer at a price the lessee declined to pay did not discharge him from obligation to offer when he decided to sell at a lower price. The lessee's `preference as a purchaser' continued during the term unless the property was sold at a price the lessee would not pay. Decision to sell at the reduced price was within the tenor and scope of the option, and the lessee's right to buy thereat was given as much as the right to buy at the higher price. The option did not mean that its obligation should be discharged upon the rejection of a single offer. A contrary view, if it would not be promotive of bad faith, would largely destroy the evident purpose the option sought to accomplish."
In Restatement, Property, 2442, § 413, it is stated that, where the rights of the designated person (in such a case as this) are contingent upon the desire of the owner to sell, the divisions of the contract are analogous to options upon a condition precedent, and subject to many of the same rules. In other texts are found the following statements concerning these rules:
"In the exercise of the option, time is of the essence; . . . However, where the lessor prevents the exercise of the option during the time limited, he may not avail himself of his own wrong, and the lessee has a reasonable time to exercise it after the obstacle has been removed." 51 C.J.S. 644, § 84.
"It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." 3 Williston on Contracts (Rev. ed.) 1952, § 677.
This court, in the case of Union Oil Co. v. Hale, 163 Wn. 503,2 P.2d 87, held that, under a two-year lease, from September 1, 1927, containing an option to renew the lease for one year, and a further option "to elect, at any time prior to August 31st, 1930," to purchase the demised premises, the option to purchase was not dependent upon the renewal of the lease for a third year. The lessee held over after the *Page 197 
expiration of the lease and the option was held effective although exercised after the expiration of the lease.
In the course of the opinion, we quoted from 35 C.J. 1040, the following:
"`Under the rules of construction applicable to contracts generally, a provision in a lease giving an option to purchase will be so construed as to effectuate the intention of the parties where it is ascertainable from the language employed by them, and where the parties express without ambiguity their intention, no room for juridical construction is left and no court can alter their agreement, although the bargain is hard or unwise.'"
In the case of Time Oil Co. v. Palmer, 28 Wn.2d 272,182 P.2d 695, this court held that a lessee's option to purchase, contained in the lease agreement, was based upon a good consideration and was enforcible. It was held that the lessee had the unqualified right to purchase at any time the lessor decided to sell. The opinion continues: "Mrs. Bogardus decided to sell. It mattered not to whom, or when, and respondent elected to exercise its right to purchase." This court affirmed the judgment of the superior court, holding that the lessee's right was superior to the right of the third party to purchase the property. In the case cited, the lessor, while a party to the action, did not defend the action, the contest being between the lessee and a third party who relied upon an option granted by the lessor.
[2] By the paragraphs of the lease agreement between the parties above quoted, there was granted to appellant an option to renew the lease for another five-year term after the expiration of the first term fixed by the lease. Appellant availed itself of this option and, after the expiration of the second term, the lease was again renewed, and the lease was maintained in full force and effect until December 31, 1946. By another provision of the lease, respondent agreed "that if at any time or times during the term of this lease or during the five year period of extension, if extended, Pacific decides to sell, subject to this lease," the demised premises, it would give to appellant "the first right and privilege of purchasing the same at the price it is willing or at any time *Page 198 
or times offers to sell to others and upon the same terms and conditions." The lease then provided that appellant should have thirty days from the date of receipt from respondent of written offer to sell in which to accept the same.
While the option granted referred only to the term of the lease and the one extension thereof provided for, it should be held that the option right continued during any subsequent agreed extensions of the lease, and this construction thereon was evidently adopted by respondent at all times during the extended terms of the lease agreement.
The thirty-day period accorded to appellant to consider any offer by respondent to sell, which respondent should submit to appellant during the term of the lease, would continue for the period mentioned, even though the term of the lease might end before the expiration of the thirty-day period. The language of the lease is clear and unambiguous. The basic condition precedent, which vests appellant with the right to consider a purchase of the property, was respondent's decision to sell during the term of the lease. If such a decision was reached during the term of the lease, appellant was entitled to the first right or option to purchase the property at the price for which respondent was "willing or at any time or times offers to sell."
Respondent had the right to sell the properties subject to the lease at any time, and it could, of course, decide, or be "willing," to sell the properties during the term. There is nothing in the lease which states that appellant's option must be exercised during the term of the lease which granted appellant thirty days, after notice from respondent, within which to decide to exercise the option or decline to do so.
The next question to be determined is whether or not respondent decided, or was willing, to sell the properties in question prior to the expiration of the lease. Respondent vigorously contends that nothing short of a definite authorization to sell at a certain price by a two-thirds vote of respondent's stockholders would amount to a decision to sell on the part of respondent.
Respondent relies upon the general rule that corporations act through their boards of trustees and their stockholders, *Page 199 
and that certain corporate acts must be ratified by the stockholders, sometimes by a two-thirds majority thereof. Respondent particularly relies upon Rem. Rev. Stat. (Sup.), § 3803-36, referring to a voluntary sale of all the assets of the corporation, providing that, in certain cases, authorization for such a sale
". . . shall be given at a meeting of shareholders, duly called for the purpose, and by such vote of the shareholders as may be provided for in the articles of incorporation or, if there be no such specific provision, then by the vote of the holders of two-thirds of the voting power of all shareholders. . . ."
The option granted by the agreement to appellant was contingent only upon a decision by respondent to sell its properties. The price formally agreed upon as the selling price was, immediately after the expiration of the term of appellant's lease, definitely adopted by the corporation itself and by all the agencies of the corporation, including the stockholders. Evidently the price fixed was satisfactory. One trustee, Mr. Brooks, objected at the meeting held January 6, 1947, as hereinabove set forth, but evidently not to the price fixed for the sale of the property, but because that trustee was of the opinion that appellant should be notified of the corporation's decision to sell.
Appellant became entitled to exercise its option if and when respondent, during the term of the lease, decided to sell, and was contingent upon the happening of that event. The price which respondent was required to quote to appellant was the figure at which respondent was willing to sell or which, at any time, it offered to sell the properties to others.
Respondent was not free to quote one price to appellant and then, as the result of negotiations with other parties, sell to another at a less price than that quoted to respondent, Respondent was free to negotiate with other parties and obtain the highest offer it could obtain for the properties, but if, during the term of the lease, respondent obtained an offer from another at which it was willing to sell the properties, *Page 200 
respondent was obligated to accord to appellant the right to purchase at that price.
[3] It is a well-recognized principle of law that in certain cases a corporation may not repudiate a transaction upon the ground that the same was not consummated in accordance with certain statutory provisions covering corporate action. 6 Fletcher, Cyclopedia Corporations (Perm. ed.) 1039, § 2949;United States Industrial Alcohol Co. v. Distilling Co., 89 N.J. Eq. 177,104 A. 216; Lost Burros Gold Mining Co. v. InyoCounty Bank, 83 Cal.App. 679, 257 P. 209; Bacich v.Northland Transp. Co., 185 Minn. 544, 242 N.W. 379.
In Ballantine, Private Corporations (1927) 323, § 98, appears the following:
"In most of the states in which the question has arisen, if not in all, statutes requiring the written assent of stockholders to a mortgage, or other act, or their assent at a general meeting, are construed as intended for their protection and benefit only, and it has been held that they can attack the mortgage only for want of such assent; that, if they acquiesce, neither creditors of the corporation nor the corporation itself can complain. If a corporation receives and retains the consideration for a mortgage, it and its stockholders may be estopped to set up want of consent of stockholders."
On page 220, § 64, appears the following:
"Where the charter of a corporation provided that, before certain contracts should be made by the corporation, the consent of the stockholders, or a certain proportion of them, should be obtained, or that notice should be given them, it was held that the provision was intended merely for their protection, and might be waived by them, and that it did not affect the powers of the corporation."
The cases of Nelson v. Hubbard, 96 Ala. 238, 11 So. 428, 17 L.R.A. 375, and Beecher v. Marq. Pac. R.M. Co., 45 Mich. 103,7 N.W. 695, are of interest in this connection.
Respondent contends that appellant's option never became effective because respondent did not sell the properties "subject to this lease," and that, under the language of paragraph No. 32 of the agreement, it was a further condition *Page 201 
precedent to appellant's right to purchase that a sale by respondent be subject to the lease.
We repeat the portion of the lease agreement pertinent to the question now under consideration:
"32. In consideration of one dollar and of the premises, Pacific agrees that if at any time or times during the term of this lease or during the five year period of extension, if extended, Pacific decides to sell, subject to this lease, . . ."
certain premises particularly described, it will give to appellant first right of purchasing, etc., supra.
The question is whether respondent's decision to sell during the term of the lease was the particular point which brought into effect appellant's option, or whether respondent's decision to sell included, as part thereof and as a necessary element of the proposed sale, that the sale should be subject to the lease.
In construing this language, the intention of the parties, when the lease was entered into, is of primary importance. Evidently the lease was prepared by able counsel, after careful consideration.
[4] A lessor cannot terminate a lease by a sale of his interests in the demised premises unless the lease so provides, or certain legal principles be held applicable, and, generally speaking, a conveyance of property, which the grantor has leased, is subject to the rights of the lessee under a lease in good standing.
The lease agreement between the parties to this action contained no provision to the effect that any sale by respondent of the properties, during the term of the lease, should end appellant's rights thereunder. The lease was for a long term, covering a manufacturing plant and a quarry.
Manifestly, if appellant's operations, pursuant to the lease, were successful, it might well be interested in purchasing the properties. If it was so interested, its interest would be the same whether respondent decided to sell subject to the lease, or otherwise. The question of importance to appellant was respondent's decision to sell the properties, *Page 202 
and, if respondent did reach such a decision while the lease was in force, appellant was careful to reserve to itself the first option to purchase.
Respondent relies upon the case of Signal Oil Co. v. RepublicInv. Co., 11 Wn.2d 325, 118 P.2d 957. This was an action brought by the lessee to enforce specific performance of an option contained in a lease of real property. The defendant lessor, June 5, 1935, leased land to a corporation, for three years from July 1, 1935, the lease providing for an extension of three additional years at the lessee's option, the option having been exercised. During the second three-year term, the lessee assigned the lease to the plaintiff in the action. Paragraphs Nos. 21 and 22 of the lease read as follows:
"`Lessor reserves the right to sell said premises during the second three years or the extended three years provided for in section 20, and should the lessor during said term determine to sell the same, it agrees to give to the lessee the first right and option to purchase said premises at the same price at which the lessor is willing to sell to any third person. Provided that said Lessee shall exercise its right to buy within 30 days after being notified in writing as herein provided by the Lessor of its intention to sell, and in the event said Lessee fails to exercise said right to buy within said thirty day period said Lessor may sell said premises to such third person and said lease shall be thereupon terminated and the Lessor released from all its terms, covenants and conditions. But the Lessee will then have sixty days time to vacate, from date of sale.
"`During the life of this lease, or any extension thereof, Lessor will not sell said premises to any person, firm or corporation dealing in petroleum products.'"
During the month of June, 1940, the then lessee requested an extension, which defendant refused. December 23, 1940, defendant notified plaintiff that it had sold the property, requesting that possession be surrendered, June 30, 1941, being the terminal date of the extended lease.
The plaintiff then notified defendant that it elected to purchase the property and brought suit for the purpose of enforcing its option. In affirming the judgment of the trial court in favor of defendant lessor, this court said: *Page 203 
"Paragraph 21 contains a number of specific provisions: (a) That the lessor reserves the right to sell the property during the second three years or the extended three-year period; (b) that, in the event that the lessor determines to sell, the lessee should have the first right and option to purchase; (c) that, in the event that the lessor determines to sell, the lessee would be given thirty days' notice in writing in order that it might exercise the option to purchase; (d) that, if the lessee did not exercise its right to purchase within thirty days after being notified in writing of the lessor's intention to sell to a third person, the lease should thereupon be terminated; and (e) that the lessee in that event should have sixty days' time from the date of the sale to vacate the premises."
The court then discussed the respective contentions of the parties, stating that appellant argued that, pursuant to paragraph No. 21 of the lease, supra, the respondent lessor had no right
". . . to sell the property to any person during the term of the lease, even though the purchaser was to take possession after the expiration of the lease. The respondent contends that paragraph 21 only had reference to a sale during the term of the lease as extended, and it could not render of the premises on the part of the lessee. It seems clear to us that the intention of the parties was in accord with the contention of the respondent. The appellant had no interest in a sale which would not disturb its possession during the term of the lease as extended, and it could not be in any way affected by such a sale.
"Cases holding that, where an option has been inserted in the lease giving the lessee the right to purchase, but containing no provision with reference to the surrender of the premises during the term of the lease, the option is enforcible, have no application to the situation presented in this case.
"The superior court correctly construed the lease as covering only a sale that would disturb the possession."
The judgment appealed from in favor of respondent was affirmed.
Of course, in the case at bar, the option in appellant's favor was effective, if and when the respondent decided to sell subject to appellant's lease. The case cited is not here controlling, the court having taken care to state the particular *Page 204 
facts upon which it based its decision, those facts differing in an essential particular from the facts in the case at bar. The opinion distinguishes the case from the case at bar.
In the lease before us, the clause "subject to this lease," referring to appellant's option to purchase, has a definite application to appellant's rights.
In 51 C.J.S. 632, § 80, appears the following:
"According to some authorities, the lessee's preferential right to purchase the property is independent of the continuance of the lease under the new lessor, and the lessee does not lose his right by the fact that a sale by the lessor would not terminate the lease or that the purchaser is willing to continue it. On the other hand, it has been held, particularly under clauses indicating such result to be the intention of the parties, that a lessee's first privilege of purchasing does not apply to a sale made subject to the rights of the tenant to remain in possession to the end of his lease, and that it has reference only to a sale during the term of the lease which would involve cancellation of the lease and surrender of the premises on the part of the lessee."
In the absence of the clause, it might possibly have been contended that if respondent had received an offer to purchase the properties and accorded to appellant the right to purchase at the price offered, which offer appellant declined, and that if respondent then sold the properties, appellant's lease should be held to have terminated, or, on the other hand, that respondent might have sold the properties subject to the lease without according appellant its right to exercise its option to purchase at the price offered to respondent. Levy v. Peabody,238 Mass. 164, 130 N.E. 261; Miller v. Compton, 185 S.W.2d 754;Garetson v. Hester, 57 Cal.App.2d 39, 133 P.2d 863.
Of course, no question such as those above suggested is before us. However, the option clause in the lease implies a definite right in respondent to sell the properties subject to the lease (which right respondent would enjoy if the agreement between the parties did not provide that respondent should not sell) and is not merely a condition limiting appellant's option in case of a decision by respondent *Page 205 
to sell during the term of the lease by excluding from its operation a sale not expressly made subject to the lease. Conditions precedent are not favored by the courts. 3 Williston on Contracts 1906, § 663; also, p. 1909, § 665.
Nor was the clause intended to exclude appellant from the operation of the option if respondent, during the term of the lease, should decide to sell to another, the actual transfer of title to be consummated after the expiration of the lease.
If respondent had decided to accept an offer from a third party for the properties six months or any other period prior to the expiration of the term of the lease, merely postponing the accomplishment of the sale until after the expiration of the term, appellant's right to the exercise of its option would have accrued at the time respondent decided to sell.
Respondent's contention, that the option granted to appellant became operative only if respondent should decide to sell subject to the lease, would be meaningless if respondent had that right in any event.
Respondent argues that appellant's option should become effective only if there was a sale subject to the lease. We have cited authorities to the effect that such an option is not effective if the lessor sells the property subject to the lease.
It is not here necessary to express any opinion as to whether these authorities state the majority rule. In the case at bar, it is reasonable to suppose that the parties, in drafting the lease agreement, agreed that the option should be effective even in case of a sale by respondent subject to the lease.
[5] Under all of the circumstances present in the case at bar, we hold that it was respondent's obligation to give appellant notice of any decision on its part to sell the demised premises during the period the lease agreement was in full force and effect, regardless of whether respondent expected to actually convey the premises prior to the expiration of the lease agreement. Respondent was obligated to advise *Page 206 
appellant of the fact that it had decided to sell, whether it reached that decision a year or a day prior to the expiration of the lease.
Manifestly, what appellant desired was a preferential right to purchase at a price satisfactory to respondent for a conveyance of the premises, no matter when respondent should make its decision to sell. Such a right was of importance to appellant, and might well be to appellant of great value, all depending, of course, upon the price at which respondent should decide to sell.
If it appears from the evidence that respondent did decide to sell or was willing to sell, at a price (as stated in the lease), prior to the expiration of the lease, and did not advise appellant of its decision, respondent breached the terms of its agreement.
It is necessary to determine whether, during the existence of the lease, respondent corporation decided to sell the demised properties, thereby rendering appellant's option effective, and, if such a decision was reached, whether it was made by persons who had authority to reach such a decision.
William T. Gardiner was, without question, the principal representative of respondent in its relations with appellant. The record discloses that, in the spring of 1946, it was decided by respondent's officers and managers that it would be advisable to sell the leased properties, if a satisfactory price could be obtained. Respondent offered to sell to appellant at an asking price of $2,500,000, which offer appellant refused.
During the month of October, 1946, the evidence discloses that the board of directors of New Jersey Pacific (the parent corporation) was willing to sell to Smith for $2,050,000. No notice of respondent's willingness to sell at this figure was given to appellant. Smith was unable to produce a buyer at the figure referred to, and negotiations were conducted with McEachern and others representing General Construction Company and eastern parties, referred to as "Kaiser interests." *Page 207 
The crucial question to be determined is whether or not, prior to the termination of the lease, December 31, 1946, respondent decided to sell at the price of $1,250,000. It is evident that, during the month of December, a bona fide offer by responsible parties to buy at the price mentioned was made to respondent. Respondent, of course, contends that there was no decision to accept this offer prior to the expiration of the lease, and Messrs. Gardiner and Windisch so testified.
In Webster's New International Dictionary (2d ed.), 680, the word "decide" is defined as meaning "to bring to a state of decision."
In The Oxford Dictionary, the word "decide" is defined as "to bring to a decision or resolve. To come to a conclusion, make up one's mind, resolve."
[6] Such a decision or determination on the part of one or more persons can frequently be proven only by circumstantial evidence.
In 31 C.J.S. 880, Evidence, § 178, appears the following:
"When the motive, intent, or knowledge of a person is pertinent to the issues in the case, the evidence to prove such matters must be relevant. Such matters are seldom capable of direct proof, and they may be proved by evidence as to the character or conduct of the person, or by other circumstantial evidence."
In 32 C.J.S. 1099, Evidence, § 1039, is found the following:
"Any issue may be proved by circumstantial evidence, or by a combination of direct and circumstantial evidence. A well connected train of circumstances is as cogent of the existence of a fact as any array of direct evidence, and may outweigh opposing direct testimony; and the concurrence of well authenticated circumstances has been said to be stronger evidence than positive testimony unconfirmed by circumstances."
After Mr. Gardiner finally became convinced that Smith could produce no purchaser, the former and other officers of respondent again negotiated with representatives of the "Kaiser interests," well knowing that the price those persons *Page 208 
would pay was much less than the price which Smith had hoped to offer.
Mr. Gardiner visited Seattle during the month of November, and then stated to Mr. Reitze (as the latter testified) that negotiations with Smith had been discontinued, that he, Gardiner, was "free as a bird." There is testimony to the effect that he informed Mr. McEachern that Mr. Windisch, accompanied by Mr. Seward, the company's counsel, would be in Seattle early in December, with authority to negotiate concerning the cement properties, and with full authority to speak for Mr. Gardiner concerning all matters connected with New Jersey Pacific.
Messrs. Windisch and Seward went to Seattle, and, December 10th, negotiations with McEachern resulted in the latter's offer to pay $1,250,000, the offer to be good until January 1, 1947. This was the offer finally accepted by respondent, and it is difficult to believe that respondent's representatives, who had gone to Seattle for the express purpose of attempting to procure an offer for the properties, merely received the offer, which they knew was a final one, without making any statement as to their purpose to recommend acceptance of the offer to the corporate authorities in New York. Evidently respondent was not only willing, but was anxious to sell. In this connection, it must be remembered that Mr. Windisch had been in frequent contact by telephone with Mr. Gardiner while these negotiations in Seattle were in progress.
The record does not indicate that, prior to the termination of the Seattle negotiations with McEachern, December 10th, Smith had again opened negotiations on behalf of anyone, or that, on the date mentioned, it was contemplated that Smith would be again heard from.
Mr. Smith testified that, sometime prior to the middle of December, a representative of respondent had told him, in effect, that he was out of the picture. He testified that, December 14th, he telegraphed Mr. Gardiner he was endeavoring to interest some people in a deal. December 16th, Mr. Gardiner telegraphed Smith to the effect that he had no *Page 209 
definite information "justifying denial of statement that you were out." Smith and one of his associates, Paul Kerfoot, then telephoned Gardiner, taking turns talking to him. Smith testified that Gardiner told him that a deal had already been made and was before the board of directors for acceptance. Kerfoot testified that Gardiner told him that he could do nothing, as the matter was out of his hands.
Mr. Gardiner denied having made any such statements. Kerfoot also testified that Mr. Gardiner, however, stated that he might be able to consider a deal for an exchange of bank stock. No definite offer was ever made along the lines suggested, and, apparently, nothing further of importance transpired in connection therewith.
If there was no understanding or agreement, as respondent contends, on the part of those negotiating on behalf of respondent, it is difficult to understand why Mr. Windisch deemed it important to ask that the offer be extended until January 10, 1947. That those acting on behalf of respondent had no real belief that Smith might succeed in producing a better offer than Mr. McEachern's is strongly indicated, if not demonstrated, by communications between Seattle representatives of respondent and Mr. Gardiner.
A meeting of the board of directors of New Jersey Pacific was held at New York, December 19, 1946. Mr. Gardiner presided, and Mr. Windisch was present. After considering matters not pertinent to this inquiry, the minutes contain the following paragraph:
"The Chairman reported that the committee appointed to consider and make recommendations concerning the disposition or future operation of the plant, quarry and related properties of Pacific Coast Cement Company and of the Steamship `Diamond Cement' owned by Pacific Coast Coal Company was not yet able to make its recommendations."
Mr. Gardiner testified he thought no other reference was made at the meeting to the negotiations for the sale of respondent's properties, and that he made no other statement or report to the directors concerning the same. He testified that he had probably discussed the matter with some of the directors, but not with Mr. Brooks, the witness stating, "I *Page 210 
didn't talk to Brooks unless necessary." Mr. Gardiner also testified that there were no other communications or negotiations between General and New Jersey Pacific, the former's offer having been a "take-it-or-leave-it proposition." The witness also testified that "we discussed whether we would form a counteroffer, but we never submitted one."
It appears beyond question that respondent's officers and the directors generally were fully advised during the month of December, 1946, of the fact that General had made a definite offer for respondent's properties in the amount stated, and it is impossible to believe that the officers and directors of the corporations concerned, including respondent, had not decided to accept General's offer, save in the happening of the very remote possibility that some better offer might materialize.
Pursuant to the provisions of the lease agreement with appellant, the latter then was entitled to be advised concerning the situation as it then stood.
It is significant that the minutes of the meeting of the directors of New Jersey Pacific, held after Mr. Windisch had returned to New York, contained nothing more than the usual statement that the committee in charge of the negotiations for the sale of the properties was not yet ready to recommend any definite action. The minutes contain no mention of the offer submitted by McEachern, nor of the possibility that an acceptable offer might be made through Smith. Mr. Gardiner testified that the committee's activities were not discussed at the meeting. From the testimony, it seems probable that it was discussed with other directors, with the exception of Mr. Brooks, one of the directors present at the meeting. From Mr. Brooks' testimony, it is evident that he was not in favor of leaving appellant out of the picture, and that the other persons concerned were anxious to deal with the interests represented by McEachern, unless a better offer should materialize.
Mr. Brooks testified that, at the meeting of the directors, held January 6, 1947, when the offer made by General to purchase the properties was formally accepted, Mr. Gardiner *Page 211 
stated that General's offer was not formally brought before the board at an earlier date because New Jersey Pacific was obligated to notify appellant if any offer to purchase was made prior to December 31, 1946. It must, of course, be noted that Mr. Gardiner denied that any such statement was made.
It is, of course, true that respondent was not under any obligation to anyone to sell the properties. It is, however, perfectly clear that respondent desired to sell and, after December 31, 1946, the properties were in respondent's possession and the business operations were in respondent's hands. It is evident that respondent, with good reason, was anxious to turn the properties over to a purchaser as soon as possible.
It must always be remembered that it was not a formal acceptance of an offer to purchase which, pursuant to paragraph No. 32 of the lease agreement, would obligate respondent to afford to appellant an opportunity to exercise its first option and privilege to purchase. Pursuant to the language of the lease, respondent's decision to sell and willingness to accept an offer obligated respondent to give appellant a notice, as called for by the agreement.
[7] The evidence shows beyond question that, during the month of December, 1946, the members of the committee in charge of the negotiations for the sale of the properties, with full authority to act, had definitely reached the conclusion that the offer made on behalf of General should be accepted, subject to the remote possibility that a better offer might be made. By the terms of the lease agreement, the committee were obligated to so advise appellant. It is evident that they did not do so because, for some undisclosed reason, they preferred to sell to General and were of the opinion that, if the formal acceptance of General's offer should be delayed until after December 31st, appellant's rights to the exercise of its first option would be foreclosed.Time Oil Co. v. Palmer, 28 Wn.2d 272, 182 P.2d 695;Burleigh v. Mactier, 108 Atl. (N.J.) 84; Driebe v. Fort PennRealty Co., 331 Pa. 314, 200 A. 62; Peerless DepartmentStores v. *Page 212 George M. Snook Co., 123 W. Va. 77, 15 S.E.2d 169; 3 Williston on Contracts (Rev. ed.) 1952, § 677.
The next question to be determined is whether or not the decision to sell, reached by the board of directors of New Jersey Pacific or the committee appointed by that board, was binding upon respondent.
[8] Generally speaking, respondent, as a corporation, could transact business only through its board of directors or by direct action of its stockholders. Rem. Rev. Stat. (Sup.), § 3803-31; Trethewey v. Green River Gorge, 17 Wn.2d 697,136 P.2d 999; Lycette v. Green River Gorge, 21 Wn.2d 859,153 P.2d 873.
This rule, however, is subject to certain qualifications:
[9] (1) It is a well-recognized principle of law that a corporation may not be used as a cloak or disguise to escape corporate liability, and that the corporate veil may be pierced when necessary to do justice in particular cases. Platt v.Bradner Co., 131 Wn. 573, 230 P. 633; State v. Davies,176 Wn. 100, 28 P.2d 322; National Bank of Commerce of Seattlev. Dunn, 194 Wn. 472, 78 P.2d 535; Dummer v. WheelerOsgood Sales Corp., 198 Wn. 381, 88 P.2d 453; 1 Fletcher, Cyclopedia Corporations (Perm. ed.) 134, § 41; Ballantine, Private Corporations (1927) 26, § 6; 18 C.J.S. 376, § 6.
(2) The foregoing principle, requiring that a corporate entity on occasion be disregarded, is especially applicable in cases involving a parent or principal corporation and subsidiary corporations which merely acquiesce in and register the decrees of their principal.
"The rule followed in many cases is that the legal fiction of distinct corporate existence may be disregarded where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation. The courts will ignore separate corporate entities in order to defeat a fraud, wrong, or injustice, at least where the rights of third persons are concerned." 18 C.J.S. 382, § 7e.
"If one corporation so dominates and controls another as to make that other merely an adjunct to it, the courts will *Page 213 
look beyond the fiction of distinct corporate entity. Briggs Co. v. Harper Clay Products Co., 150 Wn. 235, 272 P. 962. So, too, where a private person so dominates and controls a corporation that such corporation is his alter ego, a court is justified in piercing the veil of corporate entity and holding that the corporation and private person are one and the same."State v. Davies, 176 Wn. 100, 28 P.2d 322.
See, also, 1 Fletcher, Cyclopedia Corporations (Perm. ed.) 154, § 43; Seattle Ass'n of Credit Men v. Daniels, 15 Wn.2d 393,130 P.2d 892.
[10] (3) In cases when it appears that a corporation has vested an officer or officers or agents with apparent authority to transact certain business affairs, the corporation will be estopped to deny the authority of its chosen representatives and to repudiate their acts.
In Ballantine, Private Corporations (1927) 347, § 110, the rule is stated as follows:
"A corporation is subject to the same extent as a natural person to the general principle that one who holds out another, or allows him to appear as having authority to act, as his agent with respect to his business generally, or with respect to a particular matter, is estopped, as against persons dealing with him in good faith, to deny that his apparent authority is real. If a corporation, therefore, or its directors, either intentionally or negligently, clothe a particular officer or agent with an apparent authority to act for it in a particular business or transaction, and persons deal with him in good faith, it will be bound to the same extent precisely as if such apparent authority were real. In such a case, the corporation cannot set up secret instructions or rules limiting the apparent authority of its agent."
[11] It is also the rule that, although directors or trustees act as a board at regularly called meetings of the corporation, those they represent may be estopped to question the authority of their officers when acting less formally, if there has been a custom or usage to act more informally. National Bank ofCommerce v. Puget Sound Biscuit Co., 61 Wn. 192, 112 P. 265; 2 Fletcher, Cyclopedia Corporations 176, § 394.
[12] The same principle applies concerning actions by an executive committee of a corporation. Although such a committee *Page 214 
can act only through a majority of its membership, where one member of such a committee of three acts for the corporation and another member acquiesces, in such acts the corporation is bound if the committee had authority to act for the corporation. 2 Fletcher, Cyclopedia Corporations 432, § 552.
Concerning the actions of the committee of three appointed by the directors of New Jersey Pacific, the case of Roebling's SonsCo. v. Barre and Montpelier Traction Power Co., 76 Vt. 131,56 A. 530, is of interest.
Respondent owned the "Diamond" plant and the Dall Island quarry, but had not operated the properties since 1931, the date of the lease to appellant. New York Pacific owned the steamship "Diamond Cement," which was used to transport the product of the quarry to Seattle. Florida Cement owned respondent's stock. New Jersey Pacific owned ninety-three per cent of the stock of Florida Cement, controlling that corporation by its stock ownership and thereby, by completely effective, though indirect, control, conducting respondent's business. New Jersey Pacific also, by stock ownership, controlled New York Pacific.
All of these corporations shared a Seattle staff and offices in common. Respondent paid to New Jersey Pacific annually a certain proportion of the operating costs. All questions concerning respondent's business and its policy were determined by New Jersey Pacific. Apparently, the trustees or directors of respondent functioned pursuant to instructions from the directors of New Jersey Pacific.
The lease agreement between appellant and respondent was negotiated on respondent's behalf largely by Mr. Gardiner, the chairman of New Jersey Pacific's board of directors. Apparently, Mr. Gardiner, at all times after the effective date of the lease, save probably during the period he was absent in Europe, was consulted in all important business matters between appellant and respondent.
Probably, at all times after the execution of the lease, respondent's board of directors functioned only nominally *Page 215 
and as an echo for the board of directors of New Jersey Pacific.
In 1946, Mr. Gardiner negotiated with appellant concerning an extension of the lease or a sale of the properties covered thereby, and when appellant was not interested in extending the lease or in purchasing the properties at the price quoted by Mr. Gardiner, the latter sought to interest other persons in a purchase. When New Jersey Pacific appointed a committee of three to negotiate with any interested parties concerning the liquidation of the "package," Mr. Gardiner was the principal mover in the matter and evidently dominated the committee. When, in December, 1946, Mr. Gardiner was unable to visit Seattle, he requested Mr. Windisch, a member of the committee, to go to Seattle and, apparently, Mr. Windisch went to Seattle with full authority to act for Mr. Gardiner and New Jersey Pacific. It does not appear, and it is not contended, that, in the course of the negotiations during 1946, the board of directors of respondent, or any member of that board as such, had anything to do with the negotiations conducted by Mr. Gardiner or any member of the committee selected by the board of directors of that corporation. The latter committee at all times represented respondent, the legal owner of the cement plant and the quarry.
[13] After careful consideration of the record before us, we hold that, during the month of December, 1946, respondent had decided to sell the "premises" which it had leased to appellant, as described in paragraph No. 32 of the lease agreement, and had determined the price, terms, and conditions at which it was, at that time, willing to sell the same. Respondent, of course, had repeatedly offered to sell the properties to others and, beyond question, had decided to sell the properties at a price much lower than that which respondent had quoted to appellant. The record clearly shows that, during the month of December, 1946, respondent had decided to sell the properties to General at the price which the latter had offered. *Page 216 
While the negotiations had been conducted nominally by officers and directors of New Jersey Pacific, the parent corporation of respondent and its alter ego, the decisions reached were those of respondent, and to hold otherwise would be a plain violation of fundamental principles of law and equity.
At a special meeting of the stockholders of Florida Cement, (called by the directors of the corporation at a special meeting of the board, January 30, 1947), held at Seattle, February 21, 1947, a large majority of the corporate stock was represented either in person or by proxy. The corporate stock owned by New Jersey Pacific was represented by two proxies. The meeting was called by the directors for the purpose of consideration by the stockholders of a proposed sale by the corporation's wholly-owned subsidiary, Pacific Coast Cement Company (respondent), of its properties and business assets, to General, for the sum of $1,170,240.90, plus certain book costs, etc. The chairman stated that, to the best of his knowledge, the board of directors of respondent and Florida Cement consisted of the same persons. Apparently, no director of the corporation was present at the meeting, although several were available.
A motion by a stockholder to adjourn the meeting until some officer or director of the company might be present was defeated. A motion was made and seconded that the stockholders approve and consent to the sale of the properties of respondent to General Construction Company, and that certain officers of Florida Cement be authorized and directed to vote the stock of respondent company owned by Florida Cement, at a meeting of respondent's stockholders, in favor of the sale.
After discussion and objections by some of the minority stockholders, who called attention to appellant's claims, and the defeat of a motion to lay the resolution on the table, the resolution was carried by a majority vote of the stock of the corporation.
January 30, 1947, the board of directors of respondent met and called a meeting of the stockholders of the corporation *Page 217 
for the purpose of considering the resolution of New Jersey Pacific that the offer of General Construction Company to purchase respondent's properties be accepted. Pursuant to that resolution, the stockholders of respondent met the same day and passed a resolution to the effect that, as respondent was a "wholly-owned subsidiary of" Florida Cement, the matter of the approval of the sale to General be referred to the stockholders of Florida Cement for consideration. The stockholders again met, February 21, 1947, immediately after the adjournment of the meeting of the stockholders of Florida Cement, and it was then reported by the corporation's counsel that appellant had instituted this action. The meeting then adjourned, to reconvene after a current meeting of the directors of Florida Cement.
The stockholders of respondent again met, March 10, 1947, when the stockholders approved the sale to General, but resolved that, in view of the institution of this action by appellant, it was not advisable to consummate the sale, and that action in that regard be deferred until some appropriate time.
Immediately after the adjournment of the stockholders' meeting, respondent's directors met and ordered that serious consideration be given to the advisability of entering into a lease with General, pending further proceedings in the case at bar. The board of directors of Florida Cement met the same day and, in effect, took the same action.
March 20, 1947, at a meeting of respondent's stockholders, a proposed lease of the properties from respondent to General Construction Company was approved, and the corporate officers were authorized and directed to execute that lease as a corporate act, contingent upon the execution by General of an agreement with respondent.
[14] We hold that appellant's first right, or option, to purchase pursuant to paragraph No. 32 of the lease agreement, arose and became effective during the month of December, 1946, prior to the expiration of the lease. At this time, when respondent failed to advise appellant of its decision *Page 218 
to sell the properties at the price offered by General, respondent breached its lease agreement.
Under the terms of the lease, appellant was entitled to thirty days after receiving notice of respondent's decision to sell or its willingness to sell at a certain price, regardless of whether that thirty-day period extended beyond the term of the lease; and, in view of the facts disclosed by the record, we hold that appellant seasonably gave respondent notice of its election to exercise its option to purchase, and that appellant was entitled to a decree awarding appellant specific performance of its option and first right to purchase.
The final paragraph of the decree appealed from above quoted, whereby it was provided, in accordance with the agreement of the parties as recited therein, that, in the event of a reversal of the decree, the trial court should retain jurisdiction for certain purposes, is approved and affirmed.
The decree appealed from is reversed and the cause is remanded to the superior court for further proceedings, in accordance with this opinion.
If, in order to determine all questions between the parties, the superior court deems it necessary or proper to hear further evidence, the case may be reopened for that purpose.
JEFFERS, C.J., STEINERT, ROBINSON, SIMPSON, SCHWELLENBACH, and HILL, JJ., concur.
June 9, 1949. Petition for rehearing denied. *Page 219